# Olive Hill Limestone Company v. Gay-Coleman Construction Company et al.

(Decided June 10, 1932.)

JOHN M. THEOBALD and W. J. FIELDS for appellant.

FRANK C. MALIN and R. C. LITTLETON for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

The appellant, which we shall call the limestone company, sued the appellees, whom we shall call the contractors, for crushed limestone it had sold and delivered to them. The contractors, by counterclaim, sought to recoup certain losses they alleged they sustained by reason of the failure of the appellant to furnish this stone in the quantities it had contracted. It is stipulated that the limestone company furnished 20,357.7957 tons of stone for which the court instructed the jury to find for the limestone company $16,285.43, less any sum it might find for the contractors on their counterclaim. The jury found $9,000 for the contractors upon their counterclaim, and returned a verdict for the limestone company, for $7,285.43, upon which the court entered a judgment, and the limestone company has appealed. Since there is no dispute about the quantity of stone furnished and the

price, this is essentially simply an action by the contractors for breach of contract. This stone was furnished upon a contract in the form of a letter from the limestone company addressed to the contractors and accepted by them on August 27, 1930, the essential parts of which are:

"We propose to furnish you on your trucks at our Atlas Quarry all stone required by you for the construction of the Morehead-Olive Hill Road, from the Flat Fork Bridge approximately $3\frac{1}{2}$ miles west of Olive Hill to the City Limits of Olive Hill, and as much additional stone as you may desire for this project for the sum of 80c per net ton.

"We guarantee to furnish stone of such sizes and quality as shall meet the 1930 specifications of the Kentucky State Highway Commission for water bound base course, with retread top, covering the above mentioned road known as FA project 67-68 AS.

"We further guarantee to hold ourselves ready to furnish a minimum of 500 tons per day and not to accept any orders during the construction of the above mentioned project by you that will interfere with the delivery by us to you of a minimum of 500 tons per day. . . . The strict performance of this contract by the seller and the buyer shall be subject to delays occasioned by strikes, accidents and other unavoidable temporary casualties or other causes beyond the control of the seller or buyer.''

During the 56 working days between and including September 5th and November 20th, when these parties were actively working under this contract, the limestone company furnished to the contractors 20,272 tons of stone, or an average of 352 tons per day. There were but six days in which it furnished the contractors as much as 500 tons of stone per day, and on some days it almost failed to furnish any. After November 20th, it furnished the contractors some small quantities of stone used in finishing up the work, but in essence this contract terminated on November 20th.

The limestone company devotes a great part of its brief to an effort to show this contract is void for want of mutuality. If either party had refused to perform at all, then that question might be quite important, but that is not the question. Both parties treated the contract as

valid, the limestone company furnished stone under the contract and has sued upon it, and is seeking to recover for the stone so furnished, and it will have to take the bitter with the sweet. It is in no position now to question the validity of the contract.

After they had entered upon the performance of this contract, the contractors proposed to furnish a bin at the crusher for the reception of this stone and to take 700 tons per day at 69 cents per ton, but the parties never agreed upon such a change. The limestone company has seized onto that which is argues was a counter offer and which they contend was a rejection of the original offer, but this amounts to nothing for the parties continued to operate under the original agreement.

It cites section 2651b-44, Ky. Stats., and argues that, as it furnished less stone per day than it had contracted to furnish, that the buyer under that statute must pay for the stone at the contract rate. No one disputes that, but what the contractors are seeking to do is to recoup the damages it is alleged they sustained as a result of the limestone company not furnishing the quantity of stone it contracted to furnish, 500 tons per day.

It attacks the instructions upon the measure of damages and all evidence offered upon that subject. Its contention is that the true measure is the difference between the contract price and the market price at the time and place when and where delivery should have been made. The measure of damages for breach of a contract must have relation to the nature of the contract breached and the results which the parties must have anticipated would flow from the breach.

The parties both understood this stone was to be used in building a highway, and the contractors were prepared to use 500 or more tons of stone per day. Both understood that, if the contractors did not get that much stone per day, their men and machinery would be idle for some part of the day. Each day the contractors had reason by the terms of the contract to expect the limestone company to furnish them 500 tons of stone, it was their duty to prepare themselves to receive and handle that much stone, and any day the limestone company failed to furnish that much stone, if demanded, it knew the men and machinery of the contractors, necessary to handle that quantity, would be forced into idleness for a part of that day, and the extent of such idleness would be

measured by the extent to which, on that day, the limestone company failed to comply with its contract. Such enforced idleness, both parties knew, would be reflected in the cost of the finished work. Each day's failure was a separate breach. 55 C. J., p. 399, sec, 384n-54. The contractors had no means of anticipating when a breach would occur or the extent of it. The first knowledge the contractors could have of a breach would be when their trucks called for stone and their drivers were told, "That's all for to-day." The record shows it was not possible when such a breach occurred for the contractors to get then and there from some one else the stone it needed to finish out the day.

Situated as they were, getting on some days all the stone called for by the contract, getting on other days practically as much as the contract called for, being themselves under a contract to complete this highway by a certain date, and unable to obtain other stone except by having it shipped in by rail which would cost them $2.05 per ton, a prohibitive price, the contractors did the best they could, they used such stone as they could get from the limestone company, constantly urging it to comply with its contract, and it in turn constantly giving assurance that it would, but often falling far short of fully performing its contract, as a result of which Mr. Coleman, the manager for the contractors, testifies it cost the contractors $2.02 per ton to lay this stone upon this highway, and, basing his estimate upon his experience in about ten previous contracts, that, if the limestone company had fully performed its contract this stone could have been laid for $1.57½ per ton; that, by its failure to fully perform, these contractors lost the sum represented by this increased cost per ton, 44½ cents on each ton of stone laid, or a total loss of $9,058.86.

This was the only evidence from either side upon this question. The limestone company took the position it was the duty of these contractors to seek to minimize their loss by buying stone elsewhere, and that, as they had not done so, they cannot recover. It was the duty of the contractors to minimize their loss, but, if they had bought stone elsewhere, this record shows it would have cost them $2.82½ per ton to lay this stone; that would not have minimized their loss, but would have increased it. This contract called for the delivery of 500 tons of stone per day, or 50 tons per hour of a working day of 10 hours. This stone was hauled out to where it

was put on the highway in 5-ton trucks, thus a truckload was required every 6 minutes. An ordinary wagon would hold a ton, and, if this were hauled in wagons, it would mean a wagonload every 72 seconds. From this we see this contract called for such a quantity of stone and for a delivery so rapid that the limestone company necessarily knew when it failed to deliver this stone on any day that these contractors could not get it elsewhere.

This was a contract for the sale of stone for a special use, and a different rule applies in measuring the damages for its breach. See 24 R. C. L., p. 77, sec. 341; 55 C. J., p. 1117, sec. 1159.

The court instructed the jury to find for the contractors such a sum on their counterclaim as would represent the difference between what it actually cost them to lay this stone and what it would have cost them if the limestone company had delivered them not less than 500 tons of stone per day. We regard that as the correct measure in this case. See Guetzkow Bros. Co. v. A. H. Andrews Co., 92 Wis. 214, 66 N. W. 119, 52 L. R. A. 209, 53 Am. St. Rep. 909, and notes under it. These instructions follow a well-recognized rule that the measure of damages for the breach of a contract is that sum which will put the injured party into the same position he would have been had the contract been performed.

The limestone company complains of the instructions because in them the court submitted to the jury the meaning of certain parts of this contract which is technically erroneous, for the court should have determined the meaning of those parts and have told the jury what they meant, but, under the instructions given, the jury, has found this contract to mean just what the court should have told the jury it meant, and the limestone company was not prejudiced thereby.

The judgment is affirmed.