**MIZAN ARABIANS, a Minnesota partnership; Gary Libra; and Myrna Lysne, Plaintiffs-Appellees, Cross-Appellants,**

v.

**The PYRAMID SOCIETY, a Kentucky corporation, Defendant-Appellant, Cross-Appellee.**

Nos. 86–5636, 86–5769.

United States Court of Appeals,
Sixth Circuit.

Argued April 28, 1987.

Decided June 26, 1987.

Rehearing and Rehearing En Banc Denied Aug. 10, 1987.

Thomas W. Miller (argued), Miller, Griffin and Marks, Lexington, Ky., Thomas C. Marks, for defendant-appellant, cross-appellee.

Danny E. Reeves (argued), Greenebaum, Doll and McDonald, Lexington, Ky., for plaintiffs-appellees, cross-appellants.

Before KRUPANSKY and GUY, Circuit Judges, and GILMORE, District Judge.[*]

RALPH B. GUY, Jr., Circuit Judge.

Both parties appeal from the district court's judgment in this diversity action for breach of contract. Defendant, the Pyramid Society, Inc. (Pyramid), appeals from the district court's award of damages to

---

[*] Honorable Horace W. Gilmore, United States District Court for the Eastern District of Michigan, sitting by designation.

plaintiff, Mizan Arabians (Mizan). Mizan cross-appeals from the portion of the district court's judgment reducing the amount of damages. For the following reasons, the judgment of the district court is affirmed.

### I.

Mizan is a Minnesota partnership engaged in the business of breeding, showing, and selling a special breed of Arabian horses generally classified as "Egyptian-related." [1] Pyramid is a nonprofit organization dedicated to the breeding and promotion of purebred Egyptian and Egyptian-related Arabian horses. Pyramid is incorporated in Texas, and licensed to do business in the State of Kentucky. On February 29, 1984, Mizan entered into a written consignment agreement with Pyramid whereby a horse owned by Mizan would be sold at an auction to be conducted by Pyramid in Lexington, Kentucky, on June 8–10, 1984. Under the terms of the agreement, the seller could place a "reserve bid" which would establish a minimum sale price for the horse. By letter dated March 5, 1984, Mizan placed a reserve bid of $65,000 on its horse. Mizan also paid Pyramid a $5,000 pre-sale consignment fee which would be credited toward Pyramid's 12% commission fee on the sale of the horse at auction. According to the auction agreement, Pyramid was entitled to receive a minimum of 12% of the reserve bid regardless of whether the horse was sold at auction or not. [2]

Immediately prior to the auction, representatives of Pyramid urged Mizan to remove the $65,000 reserve bid. There was a factual dispute as to whether Mizan eventually complied with the request and orally removed the reserve bid prior to the auction. On June 9, 1984, the horse owned by Mizan was placed on the block and bidding began at $10,000. The bidding rose until it "hung" at $30,000. At this point the auctioneer stopped the sale and permitted the announcer to come back with some comments concerning the horse's show record. Eventually the hammer fell in favor of a group from South America who had placed the final bid at $30,000.

Immediately following the sale, the owners of the horse sought out a representative of Pyramid in order to protest the sale of the horse for less than the reserve bid price. When confronted with their protests, the representative of the Pyramid Society replied that the owners had orally removed the reserve bid. The parties were unable to resolve the dispute and the owners eventually filed suit in federal court in the Western District of Arkansas against the prospective buyers and the Pyramid Society. The horse had been moved to Arkansas and Mizan sued to restrain its further movement until the rights of the parties could be adjudicated. On November 7, 1984, a settlement agreement was reached whereby Mizan released all its claims against the purchasers and conveyed legal title of the horse to the purchasers in exchange for the original $30,000 auction price and an additional $5,000.

Following the settlement between Mizan and the purchasers, the district court granted Pyramid's motion to transfer the case to the Eastern District of Kentucky. The matter was resolved by a bench trial at which the determinative factual issue was

---

1. An Arabian horse qualifies as "Egyptian-related" if fifty percent or more of its bloodline can be traced to purebred Egyptian horses.

2. The relevant language of the contract is contained in paragraph 1 of the consignment agreement which states:

    1. SALES COMMISSION: Consignor shall pay a commission to the Society in an amount equal to twelve per cent (12%) of the sale price of the horse unless the highest bid on the horse is below the Reserve Bid and Consignor rejects such bid, in which event Consignor shall pay a sale commission to the Society in an amount equal to twelve per cent

(12%) of the Reserve Bid. If the highest bid is below the Reserve Bid, the horse will not be sold unless such bid is approved and accepted by the Consignor or Consignor's agent or representative. A pre-sale consignment fee in the amount of $5,000.00, which will be credited toward the total commission owing by Consignor, shall be paid by Consignor to the Society on or before March 1, 1984. Consignor shall advise the Society in writing of the amount of Consignor's Reserve Bid for the horse on or before May 31, 1984.
(App. 99).

whether the owners had orally removed their reserve bid prior to the auction. The court was confronted with contradictory testimony on this issue; however, the trial judge expressly chose not to discredit either party's testimony. Rather, the judge found that "there was simply a misunderstanding" between the parties. The court then went on to note that Mizan had placed its reserve bid in writing, but the alleged revocation was not in writing. Finding that there was no *unequivocal* revocation of the reserve bid, the trial court held that Pyramid had breached its contract with Mizan by selling the horse for less than the reserve bid price.

Having found that Pyramid had breached the contract, the trial court then addressed the issue of damages. First, the court found that there was no bad faith or fraud on the part of Pyramid and therefore refused to award any punitive damages. Next, the court specifically found that the fair market value of the horse was $30,000. The court based its factual finding on the sale price of the horse at auction where over four hundred prospective buyers had an opportunity to bid on the horse. Notwithstanding this factual finding, the court further found that the appropriate remedy was to grant the difference between the sale price of $30,000 and the reserve bid of $65,000. The total figure of $35,000 was then reduced by $5,000 which represented the amount paid in settlement by the purchasers to Mizan. The court further reduced the recovery by $7,800 which represented Pyramid's 12% commission on the principal amount of $65,000.

## II.

Initially we note that this matter is before the court on the basis of diversity jurisdiction. Accordingly, the substantive legal issues are governed by the relevant state law—in this case, the law of Kentucky. *See Keck v. Wacker*, 413 F.Supp. 1377, 1382 (E.D.Ky.1976) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

On appeal, Pyramid does not contest the district court's finding that it breached the contract with Mizan by allowing the horse to be sold for less than Mizan's reserve bid price. Thus, the sole issue on appeal is whether the district court was correct in its calculation of damages. Essentially, Pyramid contends that Mizan's damages should be limited to the difference between the sale price of the horse at auction and the fair market value of the horse. In this case, the district court specifically found that the fair market value of the horse was $30,000, based on the sale price at auction. *Ipso facto*, Pyramid concludes, Mizan's recovery should be zero.

In support of its position, Pyramid cites to *Olive Hill Limestone Co. v. Gay-Coleman Construction Co.*, 244 Ky. 822, 51 S.W.2d 465 (1932), wherein the Kentucky Court of Appeals stated that the proper measure of damages for breach of contract "is that sum which will put the injured party into the same position that he would have been had the contract been performed." 51 S.W.2d at 467–68. Pyramid concedes that Mizan was entitled to the return of its horse, but since that is no longer possible, Pyramid concludes that Mizan's remedy is limited to a grant of money damages equal to the fair market value of the horse as determined by the price for which it sold at auction. The flaw in Pyramid's argument is that Mizan did not bargain for the "fair market value" of the horse. Rather, according to the terms of the agreement between the parties, Mizan justifiably expected one of two results: either (1) it would receive $65,000 or more for the sale of its horse, or (2) the horse would be returned. Neither expectation was fulfilled. Since the highest bid at auction was $30,000, Pyramid should have returned the horse to Mizan unsold. Instead, Pyramid breached its contractual obligation by permitting the horse to be sold for less than one-half of the reserve price and by refusing to return the horse to Mizan. Pyramid is no longer in possession of the horse, and legal title has been conveyed to the purchaser. Therefore, Pyramid cannot complete performance by returning the horse. Thus, if Mizan is to receive the benefit of its bargain, it must be paid $65,000 for the sale of its horse.

In formulating the appropriate measure of damages, we must also consider the significant policy issues at stake in this dispute. The Kentucky Court of Appeals recently stated that the business of breeding and auctioning horses is "the Commonwealth's most prestigious and valued industry" and that the conduct of auctioneers should be viewed with "strict scrutiny" in light of the "Commonwealth's interest in maintaining the integrity of its leading industry." *See Chernick v. Fasig-Tipton Kentucky, Inc.,* 703 S.W.2d 885, 890 (Ky. App.1986). If we were to adopt the measure of damages urged by Pyramid, then auctioneers would be free to disregard reserve bids with impunity because, barring exceptional circumstances, the fair market value of a horse will generally equal the price it is sold for at auction. Thus, according to the logic of Pyramid's argument, the damages would always equal zero and the owner would never be able to recover even though the auctioneer clearly violated the consignment agreement. Obviously, such a ruling would tend to undermine the confidence of owners who seek to protect their investment by placing reserve bids on the horses they put up for auction. Therefore, we reject this approach and instead find that an auctioneer who sells a horse for less than the reserve bid price and then refuses to return the horse to its owner is liable for the difference between the reserve bid and the price for which the horse sold at auction. We believe this rule is consistent with the overall goal of "maintaining the integrity" of Kentucky's "leading industry" because it assures owners that they will have a remedy in the event that an auctioneer fails to honor the reserve bid price.

### III.

The next issue we address is whether Pyramid was entitled to receive a commission for the sale of the horse. Mizan contends that Pyramid forfeited its commission because it breached the contract by selling the horse for less than the reserve bid price. We disagree.

According to the terms of the consignment agreement, Pyramid was entitled to 12% of the sale price of the horse or 12% of the reserve bid price, whichever was higher. Therefore, the trial court held that Pyramid was entitled to a set off of $7,800 against the damages awarded to Mizan, such amount representing a 12% commission on the reserve bid price of $65,000. We find that this ruling is consistent with the expectation interest of Mizan since it entered into the agreement knowing that it was liable for the commission whether the horse sold at auction or not. Moreover, to deny Pyramid its commission would amount to an award of punitive damages which is generally not available as a contract remedy. The trial court expressly found that there was no bad faith or fraudulent conduct on the part of Pyramid. Rather, the dispute was simply the result of a "misunderstanding" between the parties. This conclusion was based, in part, on the court's observation that it was not in Pyramid's best pecuniary interest to sell the horse for less than the reserve bid price. Under these circumstances, we find that the district court was correct in granting the set off of $7,800.

Finally, we find that the district court was also correct in granting an additional set off of $5,000 since Mizan had already received that amount in settlement of its claims against the purchasers. As part of this settlement agreement, Mizan formally conveyed legal title to the purchasers, and thus, the settlement was directly related to the total purchase price of the horse. Accordingly, the district court was correct in subtracting that amount from the total recovery.

For the foregoing reasons, the judgment of the district court is AFFIRMED.