900 F.2d 259
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
BUSTOP SHELTERS, INC., and Bustop Shelters of Louisville,
Inc., Plaintiffs-Appellants,
v.
CLASSIC HOMES, INC., Defendant-Appellee.
 No. 88-5464.
 United States Court of Appeals, Sixth Circuit.
 April 17, 1990.
 
 1
 Before RALPH B. GUY, Jr. and ALAN E. NORRIS, Circuit Judges, and ROBERT HOLMES BELL, District Judge*.
 
 
 2
 ROBERT HOLMES BELL, District Judge.
 
 
 3
 This case presents an appeal from an opinion and order of the United States District Court for the Western District of Kentucky, affirming the judgment of the United States Bankruptcy Court in the same district. Appellants Bustop Shelters, Inc., and Bustop Shelters of Louisville, Inc., (referred to collectively herein as "Bustop"), raise five "errors" involving issues which both the district court and bankruptcy court squarely confronted.
 
 
 4
 The dispute grows out of a contractual relationship nearly five years of age when it was abruptly terminated in July, 1982. Bustop is in the business of obtaining franchise agreements from urban transit authorities to construct and maintain bus stop shelters. In September 1977, Bustop was granted a franchise by the Transit Authority of River City to erect, install, maintain, and place advertising materials on bus stop shelters throughout the metropolitan area of the City of Louisville in Jefferson County, Kentucky. The franchise agreement was to be effective for a period of ten years.
 
 
 5
 In order to discharge its responsibilities under the franchise agreement, Bustop entered into four contracts with Classic Homes, Inc., (hereinafter "Classic"), three of which are relevant to these proceedings. These contracts are known by the parties as the "construction agreement," the "maintenance agreement," and the "cleaning agreement." They were summarized by the district court below as follows:
 
 
 6
 The construction contract [was entered into in October 1977 and] provided, among other things, that Bustop would order and Classic would install four hundred bus stop shelters: one hundred the first year, a total of one hundred fifty during the second and third years, and a total of one hundred fifty during the fourth through the tenth year. Bustop was required to provide material kits needed to erect the shelters, of which a maximum of twenty per month were to be shipped to Classic. The construction contract was to automatically renew itself on a yearly basis unless mutually terminated by the parties in writing. The base contract price was set originally at $780 per unit with an escalator clause tied to a consumer price index. This was subsequently amended on March 6, 1980 to $1300 per unit.
 
 
 7
 The maintenance agreement [also commencing in October 1977,] provided that Classic would periodically maintain all Bustop shelters. Maintenance was defined to mean repairs, refinishing and repainting. Labor costs were to be billed on the basis of the time of the day when work was performed; material costs were billed at Classic's cost plus 30%. The maintenance agreement was renewable yearly on an automatic basis. No minimum or maximum number of shelters were required to be maintained and no time frames were specified.
 
 
 8
 The periodic cleaning agreement was executed on September 2, 1980, although it recites an effective date of January 1, 1980. Under that agreement, Classic was to clean the shelters weekly for $30 per unit per month. Preexisting Transit Authority of River City shelters were to be cleaned for $15 per unit. Classic was required to provide weekly reports to Bustop indicating that cleaning services had been performed. The contract was to continue for one year periods with automatic renewal unless terminated or modified in writing.
 
 
 9
 From the inception of the parties' relationship in October 1977 until July 1982, only seventy shelters were built. Shelter construction was far behind schedule, the bankruptcy court found, because of difficulties encountered by Bustop in obtaining requisite permits from local, state and federal authorities. Bustop had also been stymied by physical problems, such as inadequacy of sidewalks and lack of accessible electrical connections. Classic, however, had not insisted on strict compliance with the contractual time frames and had cooperated with Bustop in its efforts to obtain permits from regulatory authorities. Bustop's performance delays were not, at least ostensibly, a factor in the breakdown of the parties' contractual relationship.
 
 
 10
 Moreover, until July 1982, both parties were satisfied with the other's performance under the maintenance and cleaning contracts. At that time, the trouble began when Jack Goldberg, Classic's president, contacted Bustop by telephone for the purpose of collecting payments of $6,696.70 stipulated to have been due Classic for cleaning and maintenance services rendered in April, May and June 1982. Bustop, through chairman Sheridan Snyder, refused to pay this amount until Classic, in accordance with the cleaning contract, presented weekly cleaning reports verifying its performance.
 
 
 11
 This was the first time in the 22-month life of the cleaning contract that Bustop had insisted on the cleaning reports. The insistence was motivated by the recent revelation that Classic, under a separate contract with Bustop for the cleaning of shelters in Cincinnati, had not performed satisfactorily there. The insistence continued notwithstanding Bustop's acknowledgement that the Louisville shelters had been kept clean. Yet, since the cleaning reports had not previously been required, Classic had failed to prepare them and could not meet Bustop's demand. Absent the cleaning reports, Bustop maintained, the payments would be withheld to enforce credits said to be due for Classic's default in Cincinnati. Goldberg responded, on behalf of Classic, that no further work would be done until the outstanding invoices were paid. Kathy Herfel, Bustop's Account Executive, responded by letter dated July 21, 1982:
 
 
 12
 This letter references and confirms our discussion of this morning.
 
 
 13
 In light of the differences between Bustop and Classic regarding billings and payments and the resulting work stoppage, we will be making arrangements immediately to pick up our clients posters and the shelter parts belonging to the Transit Authority of River City. In addition, I will be making arrangements to clear your warehouse of our Parkline shelter kits, parts and replacement glass.
 
 
 14
 With this communication, Bustop and Classic understood all three contracts to have been terminated. When Classic refused to return Bustop's materials, Bustop commenced action for replevin and damages in the Jefferson Circuit Court. Classic filed counterclaims, alleging Bustop had breached all three contracts.
 
 
 15
 The action was removed to the bankruptcy court, where Bustop's complaint was dismissed and Bustop was adjudged to have breached the contracts. Classic was awarded damages in the amount of $419,999.56 on the construction agreement; $4,109.20 plus prejudgment interest on the maintenance agreement; and $14,118.10 plus prejudgment interest on the cleaning agreement. On appeal to the district court, Bustop raised five issues. The district court affirmed in all respects. The same five issues are now addressed to this Court. Bustop contends the district court erred: (1) in affirming the finding that Bustop, and not Classic, breached the contracts; (2) in affirming the finding that Classic had not waived its right to enforce the 400 total shelters requirement; (3) in affirming the finding that the construction agreement was not divisible; (4) in affirming the disallowance of evidence of impossibility of performance; and (5) in finding that the damages awarded were neither speculative nor excessive.
 
 
 16
 * Bustop contends Classic breached the cleaning agreement by failing to provide the required weekly cleaning reports and then caused the breakdown of the contractual relationship by unjustifiedly refusing to perform. The bankruptcy court ruled that Bustop had waived its right to enforce the cleaning report requirement.
 
 
 17
 Under Kentucky law, which governs interpretation and enforcement of these contracts, "waiver" is defined as an intentional relinquishment of a known right. Bates v. Grain Dealers National Mutual Fire Ins. Co., 283 S.W.2d 3, 5 (Ky.1955). Waiver may be express or it may be inferred from the conduct of a party. Id. It is undisputed that Bustop did not enforce the weekly cleaning report requirement for the first twenty-two months of the cleaning contract. Bustop thus unequivocally manifested an intent to relinquish its right to insist on the cleaning reports as a precondition to payment. Having done so, Bustop could not properly reverse its position to the prejudice of Classic. Stamper v. Ford's Administratrix, 260 S.W.2d 942, 943 (Ky.1953). Bustop may have been entitled to resurrect the cleaning report requirement prospectively. However, to have asserted the disregarded requirement retrospectively, without warning, after Classic had been lulled into nonobservance thereof, was to unfairly and impermissibly prejudice Classic.
 
 
 18
 The bankruptcy court and district court thus correctly concluded that Bustop was not justified in demanding cleaning reports for past months' cleaning and maintenance service. It follows that Classic was justified in withholding further performance under the cleaning and maintenance agreements until Bustop paid for past work or at least acknowledged its obligation to do so. In other words, as the district court held, Bustop breached the cleaning and maintenance agreements first by refusing to pay for services rendered.
 
 
 19
 Further, Bustop's letter of July 21, 1982, which, according to the testimony of Sheridan Snyder and Kathy Herfel (see Joint Appendix pp. 233-34 and 261-63, respectively), was intended to declare termination of all three contracts, was properly given its intended effect by the lower courts. The letter, expressly referring to the earlier conversation between Goldberg and Herfel, confirmed Bustop's breach of the cleaning and maintenance agreements. It also declared termination of the construction agreement, which appears not to have previously been a subject of the parties' dispute regarding payment for past cleaning and maintenance work. Bustop attempts to justify this action by contending Classic's withholding of further performance pertained to the construction agreement, too. Bustop contends the agreements are separate and the parties' dispute regarding the cleaning and maintenance agreements cannot justify Classic's refusal to perform under the construction agreement.
 
 
 20
 Goldberg's refusal to perform was, standing alone, ambiguous with respect to the contractual performance contemplated. Joint Appendix p. 276. However, Goldberg made the statement in the context of a discussion about payments due under the cleaning and maintenance agreements. Joint Appendix p. 277. Moreover, Herfel, the person to whom he made the statement, understood this context. Joint Appendix p. 249. And, inasmuch as Bustop had not requested construction of a shelter for over two years and no such request was pending, there simply is no factual basis to reasonably support a finding that Goldberg's statement constituted an anticipatory breach of the construction agreement. Goldberg's statement is no justification for Bustop's termination of the construction agreement. We find no error in the holding that Bustop, through the July 21, 1982 letter, breached the construction agreement by wrongfully terminating it.
 
 
 21
 Accordingly, we affirm the district court's determination that the bankruptcy court did not err in concluding that Bustop, not Classic, breached the agreements. The remaining issues involve determination and calculation of Classic's damages flowing from Bustop's breach.
 
 II
 
 22
 The bankruptcy court found that Classic, through its conduct, had waived its right to enforce the agreed upon timetable for construction of the shelters. Article III of the construction agreement provides in pertinent part:
 
 
 23
 It being further understood, and mutually agreed to that Bustop will cause to be ordered and installed by Classic a minimum of one hundred (100) units the first year; one hundred fifty (150) for the second and third years; one-hundred fifty (150) the fourth through tenth year.
 
 
 24
 By July, 1982, Bustop was bound to have ordered at least 250 shelters for construction by Classic. Only 70 shelters had been ordered and constructed. Yet, while the evidence showed that Classic was not pleased with this performance, neither did it express any intent to hold Bustop in default for having failed to meet the first and third year quotas of 100 and 150 shelters, respectively. The evidence showed that Classic was well aware of the regulatory obstacles largely responsible for the delays, was sympathetic, and even assisted Bustop in attempting to overcome them.
 
 
 25
 While the bankruptcy court found Classic had relinquished its right to enforce strict compliance with the intermediate time limits, it also found Classic had not waived the requirement for construction of 400 shelters within 10 years. It is to this finding and the district court's affirmance thereof that Bustop objects.
 
 
 26
 Waiver, again, is the intentional relinquishment of a known right, manifested expressly or by the actions of a party. Bustop presented no evidence, words or deeds, to support a finding that Classic intended to waive its contractual entitlement to construct 400 shelters at the prescribed price by October 1987. There is no evidence to support Bustop's position that the three phases of the construction agreement were severable and that Classic, by waiving its right to timely performance in the first two phases, also waived its right to any performance due during those phases beyond the 70 shelters which were ordered and constructed. The bankruptcy court and district court properly relied upon Stamper v. Ford's Administratrix, 260 S.W.2d 942 (Ky.1943), in rejecting this argument.
 
 
 27
 That Goldberg actively assisted Bustop in its efforts to obtain the requisite permits is no evidence of waiver of the total quantity requirement. Rather, it demonstrates that in spite of the delays, Classic remained hopeful and continued to operate with the understanding based upon Bustop's assurances, that eventually the contract would be completely performed. To the extent Bustop claims to have construed Goldberg's assistance as indicative of an implied waiver, such construal was unreasonable. Further, Bustop's argument that it relied on this understanding by refraining from more earnestly performing is belied by its otherwise consistent position that its default was attributable to impossibility of performance. If as the record reflects, the delays were due primarily to regulatory difficulties, then Bustop cannot be heard to argue it is prejudiced by Classic's purported "change of position." In fact, quite the contrary appears to be true. Bustop was not "lulled into inaction" or otherwise prejudiced by Goldberg's cooperation. According to Herfel's own testimony, she and Goldberg made "a serious and continuous effort to get permits during 1981" and "Jack [Goldberg] was really helpful." Joint Appendix p. 246.
 
 
 28
 Bustop agreed in writing to order a minimum of 400 shelters for construction by Classic during a ten-year period. This obligation was not altered by the parties. Classic did nothing to justify an inference that it intended to release Bustop from the obligation. We find no error with the determination that Classic did not waive the total quantity requirement of the construction agreement.
 
 III
 
 29
 Bustop also argues the construction contract is divisible by unit. Notwithstanding the language of Article III, Bustop contends the parties' course of conduct evinces an intent to treat each unit separately. In other words, Bustop contends it had no duty to order the prescribed number of shelters for construction, but that its sole obligation was to pay Classic for construction and installment of each shelter which it chose to order.
 
 
 30
 Whether a contract is entire or severable depends upon the intention of the parties, the objects to be attained and the common sense of the situation. Business Men's Assurance Co. of America v. Eades, 161 S.W.2d 920, 922 (Ky.1942). All three of these factors militate in favor of holding Bustop bound by its written agreement. First, the language of the contract clearly reflects the parties' mutual understanding that Bustop would order a minimum of 400 shelters. As indicated in part II, supra, Bustop presented no evidence that this understanding changed. Second, the object of the contract was to provide bus stop shelters for the entire metropolitan Louisville area, not simply to provide for one-by-one construction of shelters as desired by Bustop. Third, it makes sense to enforce the contract as a whole, because Classic's long-term commitment clearly involved allocation of substantial resources in anticipation of Bustop's performance.
 
 
 31
 Affirmance of the bankruptcy court's finding in this regard was proper.
 
 IV
 
 32
 Next, Bustop contends that if the construction contract would have run its 10-year course, fulfillment of the promise to order 400 shelters would ultimately have been prohibited by local, state and federal regulatory authorities. Bustop argues the bankruptcy court erred by excluding evidence of impossibility of performance in mitigation of damages.
 
 
 33
 It is not and was not disputed that governmental regulation posed obstacles to Bustop's performance. Bustop cites in particular (1) two instances in which Louisville officials exercised discretionary authority in unanticipated fashion; and (2) a federal regulation which prohibited advertising shelters along federally funded highways. The bankruptcy court did not ignore these difficulties, but held they did not excuse liability for full performance. Bustop was held to be experienced in the industry, aware of the need for obtaining necessary permits, and, absent ambiguity in the agreement, was "presumed to have contracted both for those contingencies which are expressed and for the absence of such contingencies not expressed." Joint Appendix p. 238. The district court affirmed.
 
 
 34
 The governing rules under Kentucky law are spelled out in Frazier v. Collins, 187 S.W.2d 816 (Ky.1945):
 
 
 35
 The general rule is that a party to a contract will not be relieved of the obligations undertaken by him merely because supervening events have rendered the contract unprofitable, even though the supervening event be a law, regulation or other governmental act. * * * * It is only where the governmental act makes unlawful the obligation assumed under a contract, prohibits its performance or otherwise renders performance impossible that the obligor will be excused from further performance.
 
 
 36
 Id., at 817-18 (citations omitted).
 
 
 37
 "[T]he decisions are in complete accord with an elementary principle of the law of contracts that when a party engages without qualification to do an act, his performance is not excused because it becomes onerous or unprofitable. It is deemed his own fault if he does not expressly provide against contingencies and exempt himself from responsibility in certain events."
 
 
 38
 Id., at 818-19, quoting from Mid-Continent Petroleum Corp. v. Barrett, 181 S.W.2d 60, 62 (Ky.1944).[1]
 
 
 39
 The bankruptcy court correctly applied these principles. Bustop's objection that it cannot be held to have foreseen and, through the contract's silence, to have assumed the risk of the specific restrictions it encountered, is not persuasive. Consider the nature of the restrictions complained of. The two cited exercises of discretionary authority ostensibly affected the placement of only two shelters and did not prohibit their construction, but merely prohibited their erection at Bustop's preferred locations. Similarly, the federal regulation complained of did not prohibit erection of shelters, but merely restricted outdoor advertising, the revenue-producing element of Bustop's enterprise. 23 C.F.R. Part 750. Thus, even if, arguendo, these restrictions were deemed not to have been reasonably foreseeable, they would nonetheless be ineffective to discharge Bustop's obligation, because they did not render performance unlawful, impossible or impracticable, but merely less profitable.
 
 
 40
 The proffered evidence of impossibility of performance was properly excluded.
 
 V
 
 41
 Finally, Bustop contends the damages awarded are speculative and excessive. This argument is made notwithstanding Bustop's failure to present any evidence regarding damages to the bankruptcy court.
 
 
 42
 The measure of damages for breach of contract is that sum which will put the injured party into the same position he would have enjoyed had the contract been fully performed. Olive Hill Limestone Co. v. Gay-Coleman Construction Co., 51 S.W.2d 465, 467-68 (Ky.1932).
 
 
 43
 Loss of anticipated profits as an element of recoverable damages for breach of contract is fully recognized in Kentucky. Mere uncertainty as to the amount will not preclude recovery. There must be presented, however, sufficient evidence upon which a reasonable inference as to the amount of damage can be based.
 
 
 44
 Illinois Valley Asphalt, Inc. v. Harry Berry, Inc., 578 S.W.2d 244, 245-46 (Ky.1979).
 
 
 45
 Bustop challenges the damages award in three particulars. First, as to the construction agreement, Bustop contends the bankruptcy court's method of calculation yielded an excessive award. The bankruptcy court determined that, since the intermediate timetable of the contract had been waived, Classic had no right to insist on the outstanding 330 shelters until October 1987, when the contract would have run its 10-year course. At the time, the court determined, applying the agreed upon consumer price index factor, the price paid to Classic by Bustop for each shelter would have been $1,591.25. From this sum, the court subtracted $288 per shelter, said by Goldberg to be the actual cost of construction to Classic for the period 1980 to 1987. Classic was thus deemed to have lost profits of $1,303.25 per shelter, yielding a damages award in the amount of $430,072.50 (reduced by the bankruptcy court to its present value of $419,999.56). This 81% profit margin is said to be patently excessive. Bustop asserts the bankruptcy court erred by adjusting the shelter price for inflation, but not the cost of construction, arguing Goldberg's projection that its costs would remain constant is not based upon substantial evidence and is patently incredulous.
 
 
 46
 The shelter price was adjusted for inflation pursuant to the parties' own contractual agreement. The finding that Classic's costs would remain constant is based exclusively on Goldberg's testimony, based only upon an unsubstantiated one-page typewritten listing of six elements of Classic's expenses. The bankruptcy court termed Classic's evidence of damages "uncontroverted". Bustop presented no evidence as to damages, apart from cross-examination of Goldberg.
 
 
 47
 In general, we are reluctant to view sympathetically a party who presents no evidence on the issue of damages and then, on appeal, argues the damages awarded are excessive. However, notwithstanding Bustop's want of proof, the trial court is not free to award damages which are speculative and not based upon substantial evidence. City of Ashland v. Smith, 340 S.W.2d 208 (Ky.1960); Norfolk & Western Ry.Co. v. McCoy, 61 S.W.2d 1080, 1082 (Ky.1933). Here, the award of damages, totally dependent upon self-serving, unsubstantiated testimony of plaintiff, and devoid of explanation for its failure to account for inflationary cost increases, is suspect. We cannot hold it is based upon substantial evidence.
 
 
 48
 The same reasoning applies with equal force to Bustop's second challenge. The award of damages under the construction agreement is said to be excessive also because the bankruptcy court's calculation failed to include deductions for Classic's overhead and depreciation expenses, taxes, and mitigation of damages which would necessarily have resulted from Classic's availability to do other work. All of these are unquestionably elements of Classic's normal business operations which should have been considered, yet were ignored in the damages calculation.
 
 
 49
 We acknowledge our role is not to determine whether the trial court's award of damages was properly ascertained with exactness and certainty. Roadway Express, Inc. v. Don Stohlman & Associates, Inc., 436 S.W.2d 63, 65 (Ky.1968); Illinois Valley, supra, 578 S.W.2d at 245-46. However, an award of damages will be set aside as speculative or excessive if it is not rationally supported by substantial evidence. Norfolk, supra, 61 S.W.2d at 1082. Here, the trial court's award is rationally supported by the evidence presented, but in view of the glaring deficiencies noted, such evidence can hardly be characterized as "substantial." Too many recognized and necessarily implicated factors integral to measuring damages were left unaddressed. Accordingly, we conclude the damages award for Bustop's breach of the construction agreement must be set aside as speculative.
 
 
 50
 Bustop's third challenge, regarding damages awarded under the maintenance agreement, also has merit. Under the maintenance agreement, repairs, refinishing and repainting were to be done on an "as needed" basis. In calculating lost profits damages for the period July 1982 to October 1982, when the contract could earliest have been terminated without recourse, the bankruptcy court assessed a prorated share of Classic's reported yearly maintenance profits per shelter. Inasmuch as Classic could have already realized its entire maintenance profit on any number of the shelters during the first eight months of the contract year, Bustop contends award of a prorated share of the average profit is purely speculative.
 
 
 51
 We agree. No evidence was presented to indicate either that needed maintenance had been performed prior to July 1982 or would be required thereafter. The bankruptcy court had before it insufficient evidence to support a reasonable inference as to the amount of damages. The award of a prorated share of the yearly per shelter average profit, totalling $2,709.20, was based on pure speculation and must be set aside.
 
 VI
 
 52
 In summary, we uphold the district court's affirmance of the bankruptcy court judgment in all respects except as to damages. Accordingly, the district court's ruling is AFFIRMED in part, VACATED in part and REMANDED for retrial on the issue of Classic's damages under the construction and maintenance agreements.
 
 
 
 *
 Honorable Robert Holmes Bell, United States District Court, Western District of Michigan, sitting by designation
 
 
 [1]
 These rules are consistent with the Restatement of Contracts, 2d (1981):
 Sec. 261. Discharge by Supervening Impracticability
 Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.
 Sec. 264. Prevention by Governmental Regulation or Order
 If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made.
 Comment a to Sec. 264, in pertinent part:
 With the trend toward greater governmental regulation, however, parties are increasingly aware of such risks, and a party may undertake a duty that is not discharged by such supervening governmental actions, as where governmental approval is required for his performance and he assumes the risk that approval will be denied.