Jeffrey Phillip CHERNICK and Caroline Chernick, Appellants,

v.

FASIG–TIPTON KENTUCKY, INC. and Cloverfield Farm, Inc., Appellees.

FASIG–TIPTON KENTUCKY, INC., Cross-Appellant,

v.

Jeffrey Phillip CHERNICK and Caroline Chernick, His Wife, d/b/a Chancellor Farm, Cross-Appellees.

FASIG–TIPTON KENTUCKY, INC., Appellant,

v.

CLOVERFIELD FARM, INC., Appellee.

Court of Appeals of Kentucky.

Jan. 31, 1986.

Stephen M. O'Brien, III, Landrum, Shouse & Patterson, Lexington, for appellants/cross-appellees CERNICK.

Thomas P. Bell, Judge B. Wilson, II, Fowler, Measle & Bell, Lexington, for appellee/cross-appellant and appellant Fasig-Tipton.

Michael D. Meuser, Harry B. Miller, Miller, Griffin & Marks, P.S.C., Lexington, for appellee Cloverfield Farm, Inc.

Before COMBS, McDONALD and WILHOIT, JJ.

McDONALD, Judge:

Doing business as Chancellor Farm, Bedford Hills, New York, Jeffrey P. Chernick and Caroline Chernick obtained the thoroughbred brood mare "Fiddler's Colleen" at the November, 1981 Breeding Stock Sale conducted by the Keeneland Association. A purchase price of $175,000 was tendered and the mare transported to New York. Although in foal to "Dust Commander" at the time of sale, she slipped (spontaneously aborted) twin foals on February 11, 1982, while under the care of Dr. William Bradley, the Chernick's veterinarian. Later, the mare was mated to "Match the Hatch" but failed to conceive in March of 1982. She was most recently bred to "London Company" on July 10, 1982, and pronounced by Dr. Bradley to be "in foal" on both August 4, 1982, and on September 9, 1982. However, the foal slipped prior to the Chernick's offering Fiddler's Colleen at the November, 1982 consignment sale conducted by Fasig-Tipton, Lexington, Kentucky.

Completing the standard consignment contract and entry forms supplied by Fasig-Tipton, Caroline Chernick only just complied with the requirements by supplying information relevant to "this year's produce" and "last year's produce." Fasig-Tipton was to obtain information as to prior years from Pedigree Associates, Inc. by means of access to the Jockey Club Statistical Information. (It is to be noted that these statistics may be delinquent by as many as two years; however, in this instance the delinquency covered a four-year period.) Mrs. Chernick entered "Colt by Dantan" and "slipped" in the appropriate blanks, leaving much unstated. The Chernicks failed, in fact, to say that the mare had slipped twins which they were aware would reduce her value and probably greatly reduce her breeding potential. Ten days prior to sale the contract mandated the completion of a veterinarian's certificate provided by Fasig-Tipton indicating a mare's pregnancy status. The standard form forwarded by Caroline Chernick provided for five options relating to the mare's status: 1) in foal, 2) barren and free from infection, 3) maiden, free from infection, 4) barren and not in sound breeding condition, and 5) maiden and not in sound breeding condition. In compliance, Dr. Bradley checked the second option and returned the form which was subsequently lost. Realizing the high degree of reliance placed by a purchaser upon Fasig-Tipton's sale catalog which listed the mare as "believed in foal," the sale announcers made three references to the fact, while the mare was in the ring, that Fiddler's Colleen was "not in foal," that "she is barren." There was no reference made to her recent slip.[1] It was the appellee, Cloverfield Farm Inc., which purchased Fiddler's Colleen at the sale for $85,000.

It is well recognized, in an auction sale such as this, that the auctioneer's "drop of the hammer" is indicative of the finality of a sale. Only upon precisely described cir-

---

1. For a discussion of the distinction in the trade between the terms "barren" and "slipped," *see* *Keck v. Wacker,* 413 F.Supp. 1377 (E.D.Ky. 1976), and Cohan, The Uniform Commercial Code as Applied to Implied Warranties of "Merchantability" and "Fitness" in the Sale of Horses, 73 Ky.L.J. 665, 690–692 (1985).

cumstances can the drop of the hammer be held in abeyance or suspended. In its consignment contract concerning Fiddler's Colleen, Fasig-Tipton clearly established the purchaser's right to thoroughly examine the mare to determine her pregnancy status and/or reproductive soundness. The contract also provided in part the following arbitration clause:

Any brood mare so examined whose pregnancy status and/or breeding is found not to be as represented in the veterinarian's certificate provided by consignor ... may be returned to consignor as unsold.... In the event of a material difference in findings between the veterinarians acting for consignor and buyer ... a third veterinarian shall be designated by the auctioneer ... who shall examine the mare to determine whether or not she may be returned under this CONDITION....

Immediately following the conclusion of the November 14, 1982 sales session, Cloverfield Farm recommended and caused Dr. James B. McKee, Jr. to examine Fiddler's Colleen. He found her barren and not sound for breeding due to evidence of vaginal infection. Cloverfield declined to accept the mare and requested a second opinion. Upon Chancellor Farm's request, Dr. Patricia J. Cash examined but expressed no opinion as to the mare's breeding status but penciled in "no gross signs of exudate ... infection cannot be ruled out." The day following the sale, Fasig-Tipton insisted on a third opinion and had Dr. William Fishback examine the mare. He orally indicated the mare was sound for breeding but that it would be necessary to suture the horse before she could carry a foal. The mare was then shipped to Cloverfield Farm in Maryland and later declared not to be in sound breeding condition by Dr. James S. Brown of the University of Pennsylvania. At this point Cloverfield's attempts to return the mare to Fasig-Tipton were unsuccessful, Fasig-Tipton insisting the mare was sound for the purposes of breeding. Cloverfield then demanded that the Chernicks accept return of the mare on the basis the catalog of sale contained material misrepresentations. The Chernicks refused and commenced this action against Fasig-Tipton for the mare's sale price. Cloverfield intervened, demanded rescission, return of the purchase price, and punitive as well as compensatory damages.

The case was tried before the court sitting without a jury. The court rendered exhaustive findings of fact and conclusions of law. It determined the appellants, Jeffrey and Caroline Chernick, committed fraud and misrepresentation in the sale of Fiddler's Colleen. It also determined Fasig-Tipton to have been negligent in failing to use ordinary care to obtain accurate information concerning the produce history and breeding soundness of Fiddler's Colleen prior to the sale and in its administration of the sale, particularly its "interpretation and enforcement" of the arbitration provision previously quoted herein. The court awarded Cloverfield Farm the sum of $85,000 plus interest, representing the return of the purchase price paid to Fasig-Tipton, $40,000 in punitive damages from the Chernicks, $9,931.40 for compensatory damages from Fasig-Tipton and the Chernicks, jointly and severally, and its costs which were apportioned one third to Fasig-Tipton and two thirds to the Chernicks. Appeals have been taken to this court by both Fasig-Tipton and the Chernicks. We affirm in part and reverse in part.

■ The Chernicks argue that there was no evidence to support the award of punitive damages. This court is in complete agreement with the Fayette Circuit Court's findings and conclusions and will not disturb the award of punitive damages. That such damages are appropriate is found in the overwhelming evidence that the Chernicks were aware many months before the sale, during the sale and following the sale, that the mare had a profound defect which made her unsound for the purposes of breeding. Although the Chernicks have throughout attempted to portray themselves as "novices in the thoroughbred industry," Mr. Chernick admitted that Fiddler's Colleen was a "problem mare." It is not disputed that her "problems" were not

revealed to Fasig-Tipton or to any potential buyers. The trial court found, and we agree, that her condition was deliberately and consciously suppressed. The Chernicks' attempt to unload this horse on an unsuspecting buyer amounts to "conscious wrongdoing." *See Fowler v. Mantooth*, Ky., 683 S.W.2d 250 (1984), and, as the trial court found, demonstrates the Chernicks' "wanton disregard for the rights of others," *see also Hensley v. Paul Miller Ford, Inc.*, Ky., 508 S.W.2d 759 (1974), and *Island Creek Coal Co. v. Rodgers*, Ky.App., 644 S.W.2d 339 (1982), thereby warranting the imposition of punitive damages.

■ The Chernicks' claim that the "intervening" negligence of Fasig-Tipton relieves the Chernicks of responsibility for any award of compensatory or punitive damages is also without merit. The court's findings of negligence on the part of Fasig-Tipton do not rise to the level of culpability attributed to the Chernicks' deliberate misrepresentations concerning Fiddler's Colleen's condition. Just as contributory negligence was previously unavailable as a defense to willful or wanton conduct, *see First National Ins. Co. v. Harris*, Ky., 455 S.W.2d 542 (1970), the ordinary negligence of another will not absolve one from liability for all the consequences of his "conscious wrongdoing," *see* 57 Am.Jur.2d, *Negligence* § 134 (1971), especially where, as in the instant case, the intervening acts were foreseeable and intended.

■ We disagree, however, with the trial court's assessment of the compensatory damages against Fasig-Tipton. Although we concur with the trial court's findings of negligence on the part of this appellant, the record contains no claim by the appellees for such damages from Fasig-Tipton. Furthermore, no such claim could be added subsequent to the trial in this matter as Cloverfield Farm effectuated a judicial admission relieving Fasig-Tipton of the duty to defend any claim and of any liability except for the funds it was holding for the purchase of Fiddler's Colleen by declaring before the court, "We don't make any claim for any other damages, or any damages, other than the return of our mon-

ey against Fasig-Tipton." This declaration was indeed a "formal act done in the course of judicial proceedings." *Arnett v. Thompson*, Ky., 433 S.W.2d 109, 114 (1968), citing *Sutherland v. Davis*, 286 Ky. 743, 151 S.W.2d 1021 (1941).

That the effects of the judicial admission are most serious and extensive was recognized in *George M. Eady Co. v. Stevenson*, Ky., 550 S.W.2d 473, 474 (1977), where the court said, "The doctrine of judicial admission should be applied only where statements are unequivocal...." There is neither ambiguity nor equivocation in the statement, "We don't make any claim ... other than the return of our money against Fasig-Tipton." The consequences of this statement are severe, absolving Fasig-Tipton of liability for the sought-after compensatory and/or punitive damages. It is "conclusive, in that it removes the proposition in question from the field of disputed issue ... [the admission] dispenses with the necessity of producing evidence by the opponent and bars the party himself from disputing it...." *Sutherland, supra*, at p. 1024.

Thus, as no claim was ever asserted by Cloverfield against Fasig-Tipton, it was inappropriate to make the award for compensatory damages joint and several, and the Chernicks must bear the entire responsibility for these damages. Whether they are entitled to contribution from Fasig-Tipton is an issue not currently before us for review. We find no error in the court's apportionment of the costs.

■ Throughout the course of trial and appeal Fasig-Tipton has maintained the position that its role in the controversy was merely that of stakeholder. Seeking only to forward the purchase price of Fiddler's Colleen to the rightful party, Fasig-Tipton denied its actions were anything other than reasonable and argued that Cloverfield's injuries were due solely to the fraudulent conduct of the Chernicks. However, the trial court found, and we concur, that although under the terms of the consignment contract the Chernicks were responsible for the accuracy of all information contained within the catalog of sale, Fasig-Tipton had

a fiduciary duty to the purchaser and to the Commonwealth's most prestigious and valued industry to use ordinary care to ensure that its catalog and/or announcements were as accurate and comprehensive as possible.

█ Recognizing the existence of this duty, Fasig-Tipton became dependent upon two sources of data: the Jockey Club of America computer system, and its own veterinary certificate of health. Through admission contrary to its own interests, Fasig-Tipton disclosed that the information provided by the computer system was insufficient because of the Jockey Club's reputation for delinquent entry of data into the computer network. In the instant situation this delinquently served to place Fasig-Tipton on notice that its sales catalog was incomplete and that it was under a duty to report such ensuing inaccuracies or to correct them. Fasig-Tipton failed to do so, breaching its duty, and thereby exhibited negligent behavior toward the purchasers who justifiably relied upon the information contained in the catalog of sale.

█ Further, as a condition of sale Fasig-Tipton provided a standardized veterinary certificate to be completed by the seller's veterinarian. The form provides five options: 1) in foal, based upon manual examination, 2) barren, free from infectious disease and in sound breeding condition, 3) maiden, apparently free from infection and in sound breeding condition, 4) barren and not in sound breeding condition for the following reasons, and 5) maiden, not in sound breeding condition for the following reasons.

The trial court found, and we support the finding, that information that a mare "slipped twins" is material to a breeder's decision-making process when the horse is being considered for purchase. The primary cause of a "slip" or miscarriage is a mare's carrying twin fetuses. The fact that Fiddler's Colleen had a history of previous slips including the slipping of twins would serve as notice to a prospective buyer of the mare's propensity for such an occurrence, the possibility of physical damage to the mare and the likelihood that the mare is in fact unfit for breeding purposes. Fasig-Tipton's standardized veterinary certificate failed to make provisions for the entry of this vital information. Being a model of the horse industry, Fasig-Tipton has at its disposal the expertise necessary to ascertain such information and to formulate a questionnaire the responses to which would convey a mare's complete produce record. By so doing, Fasig-Tipton would comply with both its contractual and professional duty to fully disclose all material facts. Under the circumstances as proven in this case, the veterinary certificate is insufficient to protect the consignee against claims of incomplete disclosure, the purchaser against inaccuracies, and the Commonwealth's interest in maintaining the integrity of its leading industry.

We agree with the trial court that the Commonwealth of Kentucky maintains an international reputation for excellence in the equine industry. The conduct of one of the Commonwealth's foremost consignors of breeding stock is not to be reviewed at level lower than that of strict scrutiny. Fasig-Tipton's negligent behavior is hereby noted. The sole reason Fasig-Tipton is not liable to Cloverfield Farm is, as discussed hereinbefore, because no claim was ever asserted against this appellant.

All concur.