**GIDDINGS & LEWIS, INC. (A Wisconsin Corporation), et al., Appellants/Cross–Appellees,**

v.

**INDUSTRIAL RISK INSURERS (An Unincorporated Association), et al., Appellees/Cross–Appellants.**

Nos. 2009–SC–000485–DG, 2009–SC–000825–DG.

Supreme Court of Kentucky.

June 16, 2011.

John Lewis Tate, Jason Patrick Thomas, Jamie Kristin Neal, Stites & Harbison, PLLC, Louisville, KY, Counsel for Appellants/Cross–Appellees.

Richard C. Roberts, Whitlow, Roberts, Houston & Straub, PLLC, Paducah, KY, James J. Bigoness, Edward M. Kay, Kimberly A. Hartman, Clausen Miller P.C., Chicago, IL, Counsel for Appellees/Cross–Appellants.

Opinion of the Court by Justice ABRAMSON.

█ The "economic loss rule" prevents the commercial purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself, recognizing that such damages must be recovered, if at all, pursuant to contract law. Twenty-five years ago, when the United States Supreme Court unanimously adopted the economic loss rule as a common-law aspect of admiralty law, Justice Blackmun observed that while product liability law grew out of a concern that "people need more protection from dangerous products" than might be afforded by warranties, if tort principles were extended too far then "contract law would drown in a sea of tort." *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Aligning itself with what over two decades later is clearly the majority position nationwide, the Supreme Court held that whether a product deteriorates over time or destroys itself in a "calamitous event," the rule precludes recovery in tort for repair costs, lost profits and other items that essentially equate with "the failure of the purchaser to receive the benefit of its bargain-traditionally the core concern of contract law." *Id.* at 870, 106 S.Ct. 2295. Damages for injuries to persons or "other property" may be recovered in tort but a case involving purely economic losses requires resort to the parties' contract and any express or implied warranties. A decade later in *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 879, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) the Supreme Court confronted what constitutes the "product itself" for purposes of the economic loss rule and, ultimately, held that "[w]hen a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the 'product itself.'" While neither opinion is binding on this Court,

each is instructive in deciding the commercial dispute currently before us.

The Supreme Court of Kentucky has not heretofore charted a course in what commentators and courts across the country have referred to as the "choppy waters" of the economic loss rule. Although our Court of Appeals applied it in a classic commercial transaction context some twenty years ago, *Falcon Coal Co. v. Clark Equipment Co.*, 802 S.W.2d 947 (Ky. App.1990), this Court denied discretionary review of that case and then hinted that *Falcon Coal*'s holding was too broad in *Real Estate Marketing, Inc. v. Franz*, 885 S.W.2d 921 (Ky.1994), a case regarding the sale of a defective house where the economic loss rule was really never implicated. In the midst of this confusion, numerous federal courts have attempted to predict what this Court would do if squarely confronted with a commercial case where the economic loss rule would potentially apply. This case presents that opportunity. Today we hold that the economic loss rule applies to claims arising from a defective product sold in a commercial transaction, and that the relevant product is the entire item bargained for by the parties and placed in the stream of commerce by the manufacturer. Further, the economic loss rule applies regardless of whether the product fails over a period of time or destroys itself in a calamitous event, and the rule's application is not limited to negligence and strict liability claims but also encompasses negligent misrepresentation claims. As for the impact of the rule on fraud claims, that issue awaits another case because the plaintiffs in this case pled fraud by omission, a claim that is unsustainable on the record before us, irrespective of the economic loss rule.

### RELEVANT FACTS

Appellee Ingersoll Rand purchased from Appellant Giddings & Lewis, Inc. a Diffus-

er Cell System for use in its Mayfield, Kentucky plant. The Diffuser Cell System, which consisted of a vertical turning lathe, two vertical machining centers, and a material handling system, was used to cut and shape metal parts through a series of steps. First, the operator would secure a block of metal onto the large pallet with a clamp. The material handling system then automatically shuttled the pallet and block of metal into the vertical turning lathe, which spun the pallet and metal block while computer-controlled cutting tools shaped the metal block. Next, the material handling system automatically shuttled the pallet and shaped metal into the vertical machining center, where the shaped metal was finished into its final form.

Ingersoll Rand's engineers provided Giddings & Lewis with extensive specifications for the Diffuser Cell System, including the requirement that the vertical turning lathe operate at a maximum of 690 RPM (revolutions per minute), a speed that was considerably faster than the 400 RPM customary on Giddings & Lewis machines. Giddings & Lewis apparently redesigned the bearings, transmission, and the pallet material to accommodate Ingersoll Rand's specifications, and then manufactured the Diffuser Cell System generally to the specifications provided by Ingersoll Rand in an eight-page document. The parties' written contract

included an express warranty that provided *inter alia* that the goods furnished were "the best quality of their respective kinds and ... free of defects in design, workmanship, or material."

After seven years of virtually continuous operation, by which time the express warranty had expired, an incident occurred in which the clamp, the pallet and a large chunk of spinning metal flew off the vertical turning lathe and catapulted around the workspace in Ingersoll Rand's plant. The clamp weighed 3400 pounds, the pallet 1500 pounds and the chunk of metal approximately 300 pounds. No one was injured and damage to property beyond the Diffuser Cell System itself, if any, appears to have been minimal. Ingersoll Rand engaged Giddings & Lewis to rebuild the System and filed a claim with its (Ingersoll Rand's) insurers, which paid $2,798,742.00 for repairs to the damaged machinery, overtime payments to employees and related expenses.

The insurers, now the Appellees and collectively referred to as Industrial Risk Insurers,[1] then sued Giddings & Lewis to recover the amount paid, claiming breach of implied warranty, breach of contract, negligence, strict liability, negligent misrepresentation and fraud by omission. Giddings & Lewis moved for summary judgment, which was initially denied by the trial court but granted upon reconsid-

1. Industrial Risk Insurers is an unincorporated association consisting of the following insurers: Allianz Insurance Company, a California corporation; Cigna Property and Casualty Insurance Company, a Connecticut corporation; The Continental Insurance Company, a New Hampshire Corporation; The Fidelity and Casualty Company of New York, a New Hampshire corporation; Fireman's Fund Insurance Company, a California Corporation; Fireman's Insurance Company of Newark, New Jersey, a New Jersey corporation; The Glens Falls Insurance Company, a Delaware corporation; Great American Insurance Corporation, an Ohio Corporation; Hartford Fire Insurance Company, a Connecticut corporation; Hartford Steam Boiler Inspection and Insurance Company, a Connecticut corporation; Motors Insurance Corporation, a New York corporation; Sumitomo Marine and Fire Insurance Company, Ltd, a New York corporation; Tokio Marine and Fire Insurance Company, Ltd, a New York corporation; Yasuda Fire & Marine Insurance Company of America, a New York corporation; and Zurich American Insurance Company, a New York corporation.

eration.[2] The trial court agreed Industrial Risk Insurers' implied warranty claim was barred by the statute of limitations and held that the economic loss rule, which it found was implicitly adopted by the Court of Appeals in *Falcon Coal Co. v. Clark Equip. Co.*, barred the tort claims, including those for fraud and negligent misrepresentation. The trial court considered but declined to adopt the "calamitous event" exception to the economic loss rule. Finally, the trial court held the vertical turning lathe, the two vertical machining centers, and the material handling system constituted the product, effectively preventing Industrial Risk Insurers from recovering for damage to any part of the Diffuser Cell System.

The Court of Appeals affirmed the trial court's explicit adoption and application of the economic loss rule and agreed the calamitous event exception should be rejected. However, relying on Justice Keller's dissent in *Presnell Construction Managers, Inc. v. EH Construction, LLC,* 134 S.W.3d 575 (Ky.2004), the Court of Appeals found the economic loss rule did not bar Industrial Risk Insurers' negligent misrepresentation and fraud claims because they arise in tort, independent of any contractual duty. The Court of Appeals also reversed with respect to whether the components of the Diffuser Cell System constituted one product or several individual products, finding this a question of fact for the jury.

This Court granted Giddings & Lewis' ensuing motion for discretionary review as well as Industrial Risk Insurers' cross-motion. Giddings & Lewis argues the negligent misrepresentation and fraud claims should be barred by the economic loss rule because they are not distinct tort claims arising independent of the contract. Rather, both claims reference the quality or character of the Diffuser Cell System and are thus simply the warranty claims "repackaged" which causes them to fall squarely within the ambit of the economic loss rule. Industrial Risk Insurers counters that the tort claims are not based solely on the product's failure to perform but are premised on classic tort theories beyond the scope of the economic loss rule. Industrial Risk Insurers posits that if this Court does adopt the economic loss rule, it should include exceptions for negligent misrepresentation and fraud claims and, further, an exception for "calamitous events."

Giddings & Lewis also maintains that the Diffuser Cell System constituted one product and the component parts should not be considered "other property" for purposes of the economic loss rule. Noting that the Court of Appeals' view is contrary to established precedent, Giddings & Lewis argues that that court's position would bring only the simplest of machines, those with no components, within the purview of the economic loss rule. Industrial Risk Insurers maintains the individual components of the Diffuser Cell System constitute "other property" but also argues broadly that, regardless of how the Diffuser Cell System and its parts are classified, the economic loss rule would not apply in this case because property completely distinct from the System—a remote Q stand, chucks, cables and the concrete floor—was damaged by the machine malfunction. Giddings & Lewis insists this is the first time this particular "other property" argument has been mentioned and, having been improperly raised, it should not be considered by the Court.

## ANALYSIS

The standard of review on appeal of summary judgment is whether the trial

---

**2.** The motion was granted on August 8, 2007, more than eight years after the case was filed and less than a month before the scheduled September 4, 2007 trial date.

court correctly found there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Hammons v. Hammons*, 327 S.W.3d 444 (Ky.2010); CR 56.03. An appellate court reviews a trial court's summary judgment ruling *de novo. Blankenship v. Collier*, 302 S.W.3d 665 (Ky.2010). The record must be viewed in a light most favorable to the nonmoving party and all reasonable doubts must be resolved in that party's favor. *Spencer v. Estate of Spencer*, 313 S.W.3d 534, 537 (Ky.2010) (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky.1991)). Applying these standards, we affirm in part and reverse in part the Court of Appeals and conclude that the trial court properly entered summary judgment.

## I. The Economic Loss Rule Applies in Kentucky to Negligence and Strict Liability Claims Arising from the Malfunction of Commercial Products

When the United States Supreme Court adopted the economic loss rule as part of admiralty law in *East River Steamship*, it relied heavily on *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), the case generally cited as the first articulation of the rule. In that case, the plaintiff's business was heavy hauling and the product was a truck with a defective brake system. Justice Traynor, writing for the California Supreme Court, concluded that the commercial purchaser, having suffered no losses beyond the truck itself, could not resort to tort theories but should be confined to the warranty remedy stated

in the parties' contract. *Id.* By 1986, as the U.S. Supreme Court noted in *East River Steamship*, this position held sway in the majority of jurisdictions although there was a definite minority position rejecting it. 476 U.S. at 868, 106 S.Ct. 2295. After the Supreme Court's endorsement of the economic loss rule, the tide turned further so that now virtually all states apply the rule in some form.[3] Kentucky's position, as noted *infra*, while arguably briefly apparent following *Falcon Coal Co. v. Clark Equipment Co.*, was later rendered unclear.

In *Falcon Coal Co.*, a coal operator purchased a front-end loader which self-destructed in a fire, resulting in a product liability action against the manufacturer/seller based on strict liability. 802 S.W.2d at 947. There were no damages to persons or property but the front-end loader was completely destroyed. *Id.* at 948. The Court of Appeals reasoned that Section 402A of the Restatement (Second) of Torts (1977), previously adopted by this Court, was aimed at "imposing liability for physical harm caused by an unreasonably dangerous product to the user or his other property, but not for harm caused only to the product itself" and precluded recovery. *Id.* While citing the remedies available under the Uniform Commercial Code and the *East River Steamship* decision as supportive of its decision, the Court of Appeals did not predicate its holding on the economic loss rule (which it never mentioned by name) but relied instead on its interpretation of the plain language of Section 402A of the Restatement.[4] 802

---

3. *See* Andrew Gray *Drowning in a Sea of Confusion: Applying the Economic Loss Doctrine to Component Parts, Service Contracts and Fraud,* 84 Wash. U. L.R. 1513 (2006).

4. As the Court of Appeals noted:
 Section 402A of the Restatement (Second) of Torts provides in relevant part that

 "[o]ne who sells *any product* in a defective condition unreasonably dangerous to the user or consumer or *to his property* is subject to liability for physical harm thereby caused to the ultimate user or consumer, or *to his property....*" (Emphasis added.)
 802 S.W.2d at 948.

S.W.2d at 948–49. This Court denied discretionary review.

Shortly thereafter, this Court issued *Real Estate Marketing, Inc. v. Franz*, addressing a defective house construction claim brought by the current homeowners against the original owners of the house and the builder. 885 S.W.2d at 921. As phrased by this Court, the initial issue was whether the implied warranty of inhabitability extended past the original homeowner to subsequent purchasers such as the Franzes. *Id.* at 923. Having concluded that a warranty claim was not viable without privity of contract, the Court turned to the negligence *per se* claim and found that in Kentucky "tort recovery is contingent upon damage from a destructive occurrence as contrasted with economic loss related solely to the diminution in value ..." *Id.* at 926 (citing *Dealers Transport Co., Inc. v. Battery Distributing Co.*, 402 S.W.2d 441 (Ky.1966), which had adopted Section 402A of the Restatement (Second) of Torts). Because the Franzes' claims involved gradual deterioration of the house rather than a destructive event, this Court held they had no negligence claim. *Franz*, 885 S.W.2d at 927. In what may well be dicta, this Court stated: "We do not go so far as the Court of Appeals ... in *Falcon Coal Co. v. Clark Equipment Co.*, Ky.App., 802 S.W.2d 947 (1990), limiting recovery under a products liability theory to damage or destruction of property 'other' than the product itself." *Id.* While the manner in which the *Franz* Court would restrict the holding in *Falcon Coal Co.* is not altogether clear, given the immediately succeeding discussion, perhaps the Court intended to suggest that the ban on recovery of economic loss in a product liability action would not apply in the event of a damaging event. Alternatively, the rather cryptic statement has been read to suggest that Kentucky would not apply the economic loss rule to consumer transactions.[5] *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 849 (6th Cir.2002).

In any event, this Court's first mention of the economic loss rule by name came in Justice Keller's concurring opinion in *Presnell Construction Managers, Inc. v. EH Construction, LLC*, 134 S.W.3d at 575. As has been aptly noted to this Court, *Presnell Construction*, like *Franz*, was not a classic case for application of the economic loss rule because there was no contract between Presnell, a provider of construction management services, and EH, a contractor who provided "general trades" work in the renovation of a commercial building. Each had contracted with the building owner but the two companies had never contracted with each other. As a result, there was no opportunity to negotiate the terms of their relationship. Moreover, the dispute was not over a product but rather the provision of construction services. After EH sued Presnell Construction in tort for negligent supervision of the construction project and negligent misrepresentation, this Court ultimately affirmed the trial court's dismissal of the negligent supervision claim but adopted Section 552 of the Restatement (Second) of Torts as the standard for a negligent misrepresentation claim. *Id.* at 580–82. The *Presnell Construction* majority never mentioned the economic loss rule, perhaps because the absence of a contract between the litigants, or the absence of a "product"

---

5. The case *sub judice* does not require us to consider the effect of the economic loss rule on consumer transactions but, notably, the Restatement (Third) of Torts: Products Liability makes no distinction between products produced for commercial customers and those produced for consumers. *See* Restatement (Third) of Tort § 19(a) (1998) defining "product" in relevant part as "tangible personal property distributed commercially for use or consumption."

or both of these facts, underscored its inapplicability. Nevertheless, Justice Keller discussed the economic loss rule at length, urging its adoption by Kentucky courts. His concurring opinion focused on the rule as a bar to the negligent supervision claim but concluded that the rule would not bar the independent tort action of negligent misrepresentation. *Id.* at 583–91. Notably, he also acknowledged that the economic loss rule was not mentioned in the parties' briefs, making it apparent that the interaction of that rule and the newly adopted tort of negligent misrepresentation was not really an issue before the *Presnell Construction* Court. *Id.* at 585.

■■■ Faced squarely with a classic case for application of the economic loss rule, we hold that the rule applies in Kentucky. We adopt the *East River Steamship* Court's holding that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 U.S. at 871, 106 S.Ct. 2295. This rule recognizes that economic losses, in essence, deprive the purchaser of the benefit of his bargain and that such losses are best addressed by the parties' contract and relevant provisions of Article 2 of the Uniform Commercial Code. *See* Kentucky Revised Statutes (KRS) 355.2–101 *et seq.* Like the United States Supreme Court, we believe the parties' allocation of risk by contract should control without disturbance by the courts via product liability theories borne of a public policy interest in protecting people and their property from a dangerous product. *Id.* at 867, 106 S.Ct. 2295. Thus, costs for repair or replacement of the product itself, lost profits and similar economic losses cannot be recovered pursuant to negligence or strict liability theories but are recoverable only under the parties' contract, including any express or implied warranties. Losses for injuries to people and to "other property," in these commercial transactions, remain subject to the traditional product liability theories. This holding is entirely consistent with the latest Restatement of Torts which allows the buyer of a defective product to recover in tort for injuries to persons or other property but not for economic losses. *See* Restatement (Third) of Torts: Products Liability §§ 1 and 21(1998).[6]

■■■ Because the principles underlying the economic loss rule have bearing on other issues presented by this dispute, the three policies supporting its application deserve emphasis:

> The economic loss rule marks the border between tort and contract law. Where tort law, primarily out of a concern for safety, fixes the responsibility for a de-

**6.** Section 1, "Liability of Commercial Seller or Distributor for Harm Caused by Defective Products" provides:

> One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm *to persons or property* caused by the defect.

(emphasis supplied).

Section 21, "Definitions of 'Harm to Persons or Property': Recovery for Economic Loss" provides:

> For purposes of this Restatement, harm to persons or property includes economic loss if caused by harm to:

> (a) the plaintiffs person; or
> (b) the person of another when harm to the other interferes with an interest of the plaintiff protected by tort law; or
> (c) the plaintiff's property other than the defective product itself.

The Comment to this section notes: "Products liability law lies at the boundary between tort and contract. Some categories of loss, including those often referred to as 'pure economic loss,' are more appropriately assigned to contract law and the remedies set forth in Articles 2 and 2A of the Uniform Commercial Code."

fective product directly on the parties responsible for placing the product into the stream of commerce, contract law gives the parties to a venture the freedom to allocate risk as they see fit.…

> Three policies support applying the economic loss doctrine to commercial transactions: (1) it maintains the historical distinction between tort and contract law; (2) it protects parties' freedom to allocate economic risk by contract; and (3) it encourages the party best situated to assess the risk of economic loss, usually the purchaser, to assume, allocate, or insure against that risk.

*Mt. Lebanon Personal Care,* 276 F.3d at 848 (citing Louis R. Frumer & Melvin I. Friedman, *Products Liability* § 13.11[1] (2000)).

■ In this case, all or virtually all[7] of the damages which Industrial Risk Insurers seeks to recover are economic losses, *i.e.,* repair/replacement costs for the Diffuser Cell System, costs associated with Ingersoll Rand's contracting work to outside companies, in-house overtime and other miscellaneous costs. The trial court and Court of Appeals correctly concluded the negligence and strict liability claims seeking only those types of damages must be dismissed based on the economic loss rule. We turn next to whether a so-called "calamitous event" should justify an exception to the general rule.

## II. There Is No "Calamitous Event" Exception to Kentucky's Economic Loss Rule

■ When the Diffuser Cell System in this case malfunctioned it damaged itself in what the trial court described as a "fairly spectacular" fashion. Anticipating that this Court might adopt the economic loss rule, Industrial Risk Insurers urges the adoption of a "calamitous event" or "destructive occurrence" exception for cases such as this, noting the "damaging event" reference in *Franz* as well as a series of cases from other jurisdictions where the exception is supposedly gaining traction. In fact, it appears that a majority of our sister courts do not recognize the exception, just as the U.S. Supreme Court declined to do in *East River Steamship,* 476 U.S. at 870, 106 S.Ct. 2295. *See* Restatement (Third) of Torts: Products Liability § 21 Reporter's Notes (1998, 2011 Supp.) *See also Lincoln General Insurance Co. v. Detroit Diesel Corp.,* 293 S.W.3d 487, 491 (Tenn.2009) (collecting cases and concluding that "the owner of a defective product that creates a risk of injury and was damaged during a fire, a crash or other similar occurrence is in the same position as the owner of a defective product that malfunctions and simply does not work.") In any event, we do not adopt the calamitous event exception.

Our position is not a matter of deference to the majority view or the nation's highest court but rather a matter of logic. As Justice Blackmun so succinctly stated:

> Nor do we find persuasive a distinction that rests on the manner in which the product is injured. We realize that the damage may be qualitative, occurring through gradual deterioration or internal breakage. Or it may be a calamitous.
>
> \* \* \* \* \* \*
>
> But either way, since by definition no person or other property is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost

---

7. The issue regarding damage to other property beyond the Diffuser Cell System itself was not preserved for our review, as discussed *infra.*

profits is essentially the failure of the purchaser to receive the benefit of its bargain-traditionally the core concern of contract law.

*East River Steamship*, 476 U.S. at 870, 106 S.Ct. 2295 (citations omitted).

The jurisdictions which subscribe to the calamitous event or destructive occurrence exception almost uniformly focus on the potential for what could have been: even though no person or other property was injured, the calamitous manner in which the product malfunctioned or destroyed itself could have produced serious injuries to people or property. *See, e.g., Capitol Fuels, Inc. v. Clark Equipment Co.*, 181 W.Va. 258, 382 S.E.2d 311, 313 (1989) (recognizing "potentially dangerous situation" when front-end loader burned injuring only itself); *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324 (Alaska 1981) (finding strict liability recovery appropriate where product creates a "potentially dangerous" situation even if product only damages itself). Underlying some if not all of these opinions has been what New York's highest court, in rejecting an "unduly dangerous" exception, described as a "generalized hope that permitting tort recovery would serve as an incentive for manufacturers to use the safest possible practices." *Bocre Leasing Corp. v. General Motors Corp.*, 84 N.Y.2d 685, 690, 621 N.Y.S.2d 497, 645 N.E.2d 1195 (1995). However, as that Court noted: "Since any product put into the stream of commerce has the theoretical potential to injure persons and property, the incentive to provide safe products is always present." 84 N.Y.2d at 691, 621 N.Y.S.2d 497, 645 N.E.2d 1195.

We agree that there is a steady, strong incentive for manufacturers to produce safe products as a result of not only government and industry standards and the potential for traditional product liability litigation but also as a matter of sound business practice. Declining to recognize the calamitous event exception to the economic loss rule in commercial transactions has not in the last few decades and will not in the future prompt manufacturers to produce unsafe products on the theory that suddenly safety does not matter. Moreover, declining to adopt the calamitous or destructive event exception grounds Kentucky law in what has actually occurred as opposed to what might have occurred, the facts as opposed to speculation. In other contexts, this Court has frequently condemned theories or disallowed evidence that involve speculation. *See, e.g., O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006) (summary judgment is appropriate where nonmoving party relies on little more than "speculation and supposition" to support claims); *Thrasher v. Durham*, 313 S.W.3d 545 (Ky.2010) (documents purporting to show oil well production not admissible where the provenance of documents was matter of speculation).

Finally, as the U.S. Supreme Court recognized in *East River Steamship*, courts which allow "endangered" commercial purchasers to sue for economic losses in tort for a calamitous event determine whether the exception applies by considering "the nature of the defect, the type of risk, and the manner in which the injury arose." 476 U.S. at 870, 106 S.Ct. 2295. This fact-intensive approach offers no predictability to contracting parties regarding the applicability of tort law and can produce varying results in seemingly similar cases even though, in the end, the losses in those cases, calamitous event or not, are exactly the same—economic losses. For example, in this case two Ingersoll Rand employees sensed what was about to occur and ran from the area. Under the "examine the circumstances and potential for injury" approach involved in most calamitous event cases, these circumstances certainly would suggest the potential for personal injury

although none occurred. If the incident had occurred ten minutes later, however, and for whatever reason no employee was in the vicinity, the potential for personal injury would have been non-existent. However, in both scenarios the purchaser's damages are identical. Should the applicable law depend on whether someone happens to be nearby when the product self-destructs? We think not. When only economic losses are involved, the law and logic favor contractual remedies not a sliding scale which may include tort remedies depending upon a minute-by-minute assessment of the particular circumstances surrounding a product's demise.

Having thoroughly considered the "calamitous event" rationale and its application in practice, we decline to adopt it as an exception to Kentucky's economic loss rule. To the extent *Franz*'s alluded-to limitation of *Falcon Coal* can be read to suggest that a commercial purchaser can recover economic losses under a strict liability theory if a destructive event damages the product itself, *Franz* is hereby overruled.

III. **The Product Covered by the Economic Loss Rule is the Product Which the Manufacturer Placed into the Stream of Commerce Pursuant to the Parties' Contract**

When Ingersoll Rand first contacted Giddings & Lewis about the product at issue in this litigation it sought production of a Diffuser Cell System, an integrated system which Ingersoll Rand itself defined as follows: "The system will consist of a vertical turning center, and (2) vertical machining centers tied or integrated into a machining system. This machining system will incorporate automated material handling in the form of a shuttle car with pallet transfer or the equivalent." The parties discussed Ingersoll Rand's eight pages of specifications for the Diffuser Cell System and, after some modifications, Gid-

dings & Lewis sold the System to Ingersoll Rand pursuant to a contract which, at least as to the terms of sale such as the warranty, appears to have been drafted by Ingersoll Rand. After the accident and Industrial Risk Insurers' payment of Ingersoll Rand's insurance claim, Industrial Risk contends in this litigation that in fact Ingersoll Rand purchased four separate items—the vertical turning lathe, two vertical machining systems and the material handling system. Industrial Risk maintains that the vertical turning lathe (VTL) is the defective product and, consequently, the other damaged parts of the Diffuser Cell System were "other property" not subject to the economic loss rule. In support of this argument, Industrial Risk notes that the various parts of the System have separate serial numbers, can be operated separately and have been sold separately, although they were not in this particular case.

The trial court rejected this "other property" argument with the following conclusion: "The [manufacturing] cell was purchased at one time, it is one system, and ... for purposes of the Economic Loss Rule it should be treated as one piece of property." The Court of Appeals, apparently influenced by the fact that the various parts of the Diffuser Cell System could operate independently of each other, found that it could not conclude that the VTL, vertical machining systems and material handling system were one product as a matter of law. It then deemed that determination of the relevant "product" to be an issue of fact to be decided by a jury on remand. On this issue, we must reverse the Court of Appeals because both the facts and the law support the trial court's conclusion.

In *East River Steamship*, the Supreme Court observed that the plaintiff's three primary claims related to defectively de-

signed turbine components which damaged the turbines themselves and that "since each turbine was supplied ... as *an integrated package* ... each is properly regarded as a single unit." 476 U.S. at 867, 106 S.Ct. 2295 (emphasis supplied). The Court further noted that since most machines have component parts, a ruling to the contrary would result in finding "property damage in virtually every case where a product damages itself." *Id.* (citation omitted). Later, in *Saratoga Fishing,* the Court stated unequivocally: "When a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the 'product itself' under East River...." 520 U.S. at 879, 117 S.Ct. 1783. Courts applying the economic loss rule have thus generally deemed the product to be "the finished product bargained for by the buyer" rather than its individual components. *Shipco 2295, Inc. v. Avondale Shipyards, Inc.,* 825 F.2d 925, 929–30 (5th Cir.1987). *See also N.Y. State Elec. & Gas Corp. v. Westinghouse Elec. Corp.,* 387 Pa.Super. 537, 564 A.2d 919 (1989) (where various components of a product are provided by same supplier as part of a complete and integrated package, even if one component damages another there is no damage to other property).

In ▆▆▆ *Barton Brands Ltd. v. O'Brien & Gere, Inc. of North America,* 550 F.Supp.2d 681, 689 (W.D.Ky.2008), the United States District Court for the Western District of Kentucky, anticipating this Court's approach to identifying the "product itself" for purposes of the economic loss rule, concluded that it should be "the entire unit for which a party to a complex commercial transaction has the ability to distribute risk by contract and insure against loss." This is a wholly reasonable approach which recognizes that the economic loss rule stems from the ability of the parties to the transaction to address through the purchase contract or insurance (as occurred in this case) those eco-

nomic losses that might flow from the malfunctioning of the product. Obviously, determining the product under this approach requires resort to the parties' contract, *i.e.,* what exactly was "bargained for by the buyer." *Shipco 2295, Inc.,* 825 F.2d at 930. Contract construction is a matter of law and thus an issue for the trial court, not a jury, to determine. *Morganfield Nat. Bank v. Damien Elder & Sons,* 836 S.W.2d 893, 895 (Ky.1992) ("The construction as well as the meaning and legal effect of a written instrument, however compiled, is a matter of law for the court.") *See also Exxon Shipping Co. v. Pacific Resources Inc.,* 835 F.Supp. 1195, 1199 (D.Haw.1993) ("In determining what constitutes the product [for purposes of the economic loss rule], the court looks first to the parties' contract."); *Petroleum Helicopters, Inc. v. Avco Corp.,* 930 F.2d 389, 393 n. 9 (5th Cir.1991) (determining what is "the product" and what is "other property" requires construing the parties' contract, a legal analysis); *Trans States Airlines v. Pratt & Whitney Canada, Inc.,* 177 Ill.2d 21, 224 Ill.Dec. 484, 682 N.E.2d 45, 55, 59 (1997) (same).

As noted, Ingersoll Rand submitted detailed specifications for the Diffuser Cell System as an integrated package and the parties contracted for precisely that, an integrated system. The fact that particular component parts such as the VTL could have been sold separately is irrelevant because, as with our rejection of the calamitous event exception, we look at the facts before us, what actually occurred, not speculation about what might have been. The bargained-for item placed in the stream of commerce by Giddings & Lewis pursuant to the parties' contract was the complete Diffuser Cell System. Consequently, we reverse the Court of Appeals to the extent that it found the identity of the "product itself" to be an issue of fact which must be addressed by a jury. The

economic loss rule precludes recovery in tort for any damage to the Diffuser Cell System because that System was the "product itself" and any economic losses arising from its malfunction must be recovered pursuant to the terms agreed upon by the parties in their contract or any relevant provisions of Article 2 of the Uniform Commercial Code.

## IV. Industrial Risk Insurers Has Not Preserved for our Review the Issue of Damage to "Other Property" Beyond the Diffuser Cell System

 Having rejected the argument that the VTL alone constitutes the product and the other components of the Diffuser Cell System constitute "other property," we turn to a second "other property" argument. Industrial Risk Insurers also argues that additional "other property" was damaged, namely a remote Q stand, chucks, cables and the concrete floor, all of which was separate and distinct from the Diffuser Cell System purchased from Giddings & Lewis. With this argument, Industrial Risk Insurers maintains there is still "other property" damage to prohibit application of the economic loss rule. After careful review of the record, we find Industrial Risk Insurers did not sufficiently raise the issue of this additional "other property" in the trial court and, as such, is precluded from now making the argument to this Court.

Industrial Risk Insurers argues the issue was properly raised because the damage to this additional "other property" was discussed in various depositions, was noted in a service and installation report,[8] was included in the Amended Complaint,[9] and

was argued in its Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Memorandum). It is clear that a party does not properly raise a legal issue by simply including factual information in a complaint or discussing those facts in a deposition or an exhibit. While Industrial Risk Insurers did make an "other property" legal argument in its Memorandum, that argument was distinctly different from the one now made to this Court. The other property referred to in the trial court Memorandum was the collection of components of the Diffuser Cell System beyond the VTL, not any separate or distinct property located in the vicinity of the System. Industrial Risk Insurers designated the VTL as the product that malfunctioned and, when describing the damage caused, specified only damage to other parts of the Diffuser Cell System. Industrial Risk Insurers did not premise its "other property" argument on damage to property separate from the Diffuser Cell System, and we will not read general phrases such as "other property," "nearby machinery" or "equipment in the area" to refer to such distinct property where it is clear from specific argument in its Memorandum and the record as a whole that Industrial Risk Insurers considered the VTL to be the product and the other components of the Diffuser Cell System to be the other property, machinery or equipment that was damaged.

This Court has long held that a party may not argue one theory to the trial court and then a different theory to an appellate court, which is "without authority to review issues not raised in or decided by the

---

8. The service and installation report, prepared by Giddings & Lewis, was attached as Exhibit G to the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. If scrutinized carefully, one may be able to read "remote que de-

stroyed," "cables damaged," and, perhaps, that the floor was gouged or cracked.

9. The Amended Complaint simply states the malfunction caused "severe and extensive damage to the VTL and other property of Ingersoll Rand."

trial court." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 734 (Ky.2009). Recently, in *Fischer v. Fischer*, 348 S.W.3d 582 (Ky.2011), this Court refused to consider an appellee's argument, which while similar to one made to the trial court, was not specifically argued to the trial court. As we noted, "when a movant states specific grounds ... to the trial court, the court rules on those grounds. The court's decision, then, is essentially a denial of the movant's specific argument—of the grounds argued." The Court reiterated, "Specific grounds not raised before the trial court, but raised for the first time on appeal will not support a favorable ruling on appeal." *Id.* As in *Fischer*, Industrial Risk Insurers now makes an argument that, while similar to that made to the trial court, was never specifically presented to the trial court. Because Industrial Risk Insurers did not raise the issue of damage to property other than the Diffuser Cell System for specific consideration in the trial court, we decline to address that issue in this Court.[10]

## V. The Economic Loss Rule Extends to Negligent Misrepresentation Claims

██ Industrial Risk Insurers contends that even if the economic loss rule precludes negligence and strict product liability claims when a product malfunctions, it should not bar a negligent misrepresentation claim associated with that product. Giddings & Lewis counters that when the alleged misrepresentations relate solely to the character, nature and performance of the product itself, the claim is essentially an attempt to make an end-run around the negotiated warranty in the parties' contract and the economic loss rule should

apply just as it does to negligence and strict liability theories. We agree and find the negligent misrepresentation claim unsustainable on this ground and also for a more elementary reason—the failure to identify affirmative false information supplied by Giddings & Lewis.

As previously noted, negligent misrepresentation was first recognized specifically as a basis for recovery in Kentucky in *Presnell Construction*, 134 S.W.3d 575, a case in which EH, a contractor which provided "general trades" work on a construction project, sued Presnell, the company providing construction management services for the project. There was no contract between EH and Presnell, each of which had contracted separately with the owner of the building. Moreover, there was no product involved. Specifically, EH alleged that Presnell failed to properly "stage and time" the work at the construction site and, as a result, EH "was required to redo much of the work that it had already completed, due to the other contractors and subcontractors coming in and subsequently destroying work" EH had previously completed. *Presnell Construction*, 134 S.W.3d at 578. In this context, this Court adopted Section 552 of the Restatement (Second) of Torts (1977) which provides in pertinent part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise

---

10. In any event, it is apparent from the record that the damage to property beyond the Diffuser Cell System was *de minimus*. *See Delmarva Power & Light v. Meter–Treater, Inc.*, 218 F.Supp.2d 564, 570–71 (D.Del.2002) (cit-

ing numerous cases holding minimal damage to other property does not preclude application of the economic loss rule where primary losses are economic).

reasonable care or competence in obtaining or communicating the information. (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Although Section 552 had never been adopted before, the *Presnell Construction* court noted prior Kentucky cases which were consistent with the negligent misrepresentation claim. For example, in *Seigle v. Jasper*, 867 S.W.2d 476 (Ky.App.1993), an attorney hired by a bank to provide a title opinion failed to inform any of the parties involved of an oil company's easement on the property. The appellate court found that the attorney could be liable to the purchasers of the property who, although they had not hired the attorney, had paid his fees at the closing and had relied on his title opinion to their detriment in purchasing the property. Similarly, in *Chernick v. Fasig–Tipton Kentucky, Inc.*, 703 S.W.2d 885 (Ky.App.1986), the consignor/auctioneer of a thoroughbred was held to have a duty to issue a catalog with information as accurate as possible for potential purchasers at the auction. When the auctioneer failed to determine the breeding history and soundness of a mare, it was negligent in its "behavior toward the purchasers who justifiably relied upon the information contained in the catalog." *Id.* at 890.

These cases are instructive because they all involve a party who "supplies false information for guidance of others in their business transactions" and is liable to the recipient for failing to "exercise reasonable care or competence in obtaining or communicating the information." Restatement (Second) of Torts § 552. A construction consulting firm and an attorney providing a title opinion, as well as an auctioneer, offer services which consist of information upon which others will rely. A manufacturer of a product is not in the business of supplying information but rather the product itself and, only incidentally, information about the product. The product and any information about its character, nature or performance are properly the subject of the parties' contract.

■■■ This was essentially the holding in *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.*, 955 F.2d 1043 (6th Cir.1992), a case in which Miller's purchased defective carburetors ("Acucarbs") from Borg–Warner. Anticipating Kentucky law, the Sixth Circuit concluded that Kentucky would not recognize a negligent misrepresentation claim in a commercial product sale. The Court noted that Miller's allegations were simply that Borg–Warner had misrepresented several facts regarding "the quality, nature and appropriate uses of the product" and that Borg–Warner should have known that customers relying on those products would suffer economic losses if they malfunctioned:

Although dressed in a different costume, the essence of Miller's claim is that its losses occurred as a result of the Acucarb's defects and failure to perform as expected. "But the injury suffered—the failure of the product to function properly—is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 868, 106 S.Ct. 2295, 2300, 90 L.Ed.2d 865 (1986). Thus, the Supreme Court's reasoning in *East River* preclud-

ing negligence-based actions for purely economic losses, which we have expressly adopted ... applies with equal force to the tort of negligent misrepresentation in a commercial context.

955 F.2d at 1054. While a negligent misrepresentation claim obviously was recognized several years later in Kentucky in *Presnell Construction,* it was not in the context of a sale of a commercial product but in the context of construction services where the parties to the dispute had no contractual relationship. Indeed, the language of Section 552 is poorly suited to a product sale. While Section 9 of the Restatement (Third) of Torts now specifically provides for a negligent misrepresentation claim in the context of a sale of a defective product, significantly, the Restatement adheres to the approach we adopt today—the tort claim is for recovery of damages to persons or other property, not damages to the product itself or other forms of economic loss.[11]

Turning to the facts before us, in its Amended Complaint, Industrial Risk Insurers alleges that Giddings & Lewis represented that the VTL portion of the Diffuser Cell System could safely operate at the 690 RPM specified by Ingersoll Rand's engineers. Although no specific oral or written representation is identified in the Amended Complaint or the briefs to this Court, it appears that Industrial Risk Insurers is alleging that by manufacturing and selling the System, after engineering adjustments to Ingersoll Rand's specifications, Giddings & Lewis implicitly represented it was a safe, non-defective product. Such implicit representations in the course of the sale are not enough to state a prima facie case as to this particular tort because

negligent misrepresentation requires an affirmative false statement. *Republic Bank & Trust Co. v. Bear, Stearns & Co.,* 707 F.Supp.2d 702, 714 (W.D.Ky.2010) ("Importantly, this tort requires an affirmative false statement; a mere omission will not do.") *See also* Restatement (Third) of Torts § 9 (requiring a "misrepresentation of material fact concerning the product.") Thus, it seems clear that Industrial Risk Insurers has not properly stated a negligent misrepresentation claim. However, even if an affirmative statement were present, the economic loss rule would bar recovery of economic damages pursuant to a negligent misrepresentation theory because we find persuasive the rationale enunciated in *Miller's Bottled Gas* and incorporated into the Restatement (Third) of Torts, to wit, the economic loss rule applies to a negligent misrepresentation claim just as it does to negligence and strict product liability claims. Accordingly, we reverse the Court of Appeals' opinion to the contrary and find that the trial court correctly dismissed Industrial Risk Insurers' negligent misrepresentation claim.

### VI. Industrial Risk Insurers Has Not Stated a Viable Fraud by Omission Claim

Although Industrial Risk Insurers frequently refers to its final claim as simply a fraud claim, it is apparent that the claim asserted was actually "fraud by omission," as reflected by both the title and substance of Count VII of the Amended Complaint. This claim is apparently premised on a Giddings & Lewis internal memorandum from the sales department

---

11. Section 9, "Liability of Commercial Product Seller or Distributor for Harm Caused by Misrepresentation" provides:

One engaged in the business of selling or otherwise distributing products who, in connection with the sale of a product,

makes a fraudulent, negligent, or innocent misrepresentation of material fact concerning the product is subject to liability for harm to persons or property caused by the misrepresentation.

to the engineers dated October 12, 1988, just days after the manufacturer received the Ingersoll Rand specifications:

> I am in the process of writing up the order for the cell which will contain this 36″ VTL, which is quoted to operate at up to a maximum RPM of 690. *As this exceeds our 400 RPM maximum by a considerable amount, I believe it is proper to get a disclaimer from Ingersoll–Rand Company against operating this machine under unsafe conditions.* As this machine is going to operate using 38″ dia. plain pallets, the maximum peripheral speed of the pallets will be approximately 7,000 surface feet when operating at maximum RPM. *This may create unsafe conditions due to loss of clamping pressure due to centrifugal force or loss of clamping force due to the forces created by unbalanced work pieces, fixtures and/or the machine itself*

In the ensuing weeks, all parties acknowledge that the order was forwarded to the engineering department where adjustments were made to the transmission, bearings and pallet material, and the VTL operating at 690 RPM was deemed a "doable" project. Giddings and Lewis ultimately acknowledged or accepted the Ingersoll Rand purchase order approximately six weeks later on November 23, 1988. The machine was delivered to Ingersoll Rand in February 1990, after having undergone trial production runs at Giddings & Lewis' facility. The Diffuser Cell System operated for seven years before the incident at issue in this litigation.

 "Fraud by omission is not the same, at law, as fraud by misrepresentation, and has substantially different elements." *Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.,* 113 S.W.3d 636, 641 (Ky.App.2003). Fraud through misrepresentation requires proof that: (1) the defendant made a material representation to the plaintiff; (2) the representation was

false; (3) the defendant knew the representation to be false or made it with reckless disregard for its truth or falsity; (4) the defendant intended to induce the plaintiff to act upon the misrepresentation; (5) the plaintiff reasonably relied upon the misrepresentation; and (6) the misrepresentation caused injury to the plaintiff. *Flegles, Inc. v. TruServ Corp.,* 289 S.W.3d 544, 549 (Ky.2009). *United Parcel Service Co. v. Rickert,* 996 S.W.2d 464 (Ky.1999). By contrast, a fraud by omission claim is grounded in a duty to disclose. *Republic Bank,* 707 F.Supp.2d at 710 ("The gravamen of the tort is breach of a duty to disclose....") To prevail, a plaintiff must prove: (1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence. *Rivermont Inn,* 113 S.W.3d at 641. The existence of a duty to disclose is a matter of law for the court. *See Smith v. General Motors Corp.,* 979 S.W.2d 127, 129 (Ky.App.1998). *See also* Restatement (Second) of Torts § 551 cmt. m (1977) ("whether there is a duty to the other to disclose the fact in question is always a matter for the determination of the court.")

 Industrial Risk Insurers' fraud by omission claim founders on the first element. Kentucky recognizes a duty to disclose in four circumstances. *Smith,* 979 S.W.2d at 129–30. The first two, the duty arising from a confidential or fiduciary relationship or a duty provided by statute, are plainly inapplicable to the commercial sales transaction in this case. The two other circumstances where a duty may arise are "when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure", *Rivermont Inn,* 113 S.W.3d at 641, or

"where one party to a contract has superior knowledge and is relied upon to disclose same," *Smith,* 979 S.W.2d at 129.

■ The "superior knowledge" duty is illustrated by *Smith* wherein a new vehicle dealership failed to disclose that a "new" van had already received extensive repairs following instances of stalling while traveling at highway speeds. Having serviced the vehicle twice, the dealership was in an obviously superior position at the time of the sale yet it withheld information about the van's history of stalling and repairs from the consumer-purchaser. The Court of Appeals found a common law duty to disclose due to the dealership's superior knowledge of the past problems with the vehicle and attendant repairs as well as statutory duties to disclose based on the Motor Vehicle Sales provisions of the Kentucky Revised Statutes. In this case, Ingersoll Rand's engineers drafted eight pages of specifications and worked with Giddings & Lewis's engineers in refining those specifications to produce the eventual Diffuser Cell System. This contract for a custom-made product resulting from engineering input by both the buyer and seller is plainly not an instance of one party having superior knowledge not available to the other. Indeed, the "knowledge" that Industrial Risk Insurers refers to, the increased risk that a more rapidly revolving lathe would throw a metal part, appears from the record to be nothing more than a concern expressed early-on by someone in Giddings & Lewis' sales department to the company's engineers, a concern consistent with what any engineer would recognize as the consequences of increased centrifugal force. If there was evidence that Giddings & Lewis had actual knowledge, either through its testing or other means, that a vertical turning lathe revolving at 690 RPM as was ultimately manufactured was unsafe and kept that specific knowledge from Ingersoll Rand and its engineers, perhaps a duty could arise but those are not the facts. Industrial Risk Insurers' cannot establish that Giddings & Lewis had superior knowledge to that of Ingersoll Rand that was not disclosed and thus no duty arose under this theory.

■ The final potential source of a duty to disclose is in the case of partial disclosure. The information that Industrial Risk Insurers points to is again simply one salesperson's observation that the higher RPM specified by Ingersoll Rand "may create unsafe conditions due to loss of clamping pressure due to centrifugal force or loss of clamping force due to the forces created by unbalanced work pieces, fixtures and/or the machine itself." An actionable misrepresentation (and by analogy an actionable omission) must "relate to a past or present material fact." *Flegles,* 289 S.W.3d at 549. This statement is not so much a fact as a concern. This concern was stated very early in the purchase order review process by a member of Giddings & Lewis' sales department and plainly was not an experienced fact, just an observation borne of consideration of basic principles of engineering, principles known to the engineers involved on both sides of the sales transaction. Ultimately, Giddings & Lewis concluded that with modifications the project was "doable" and the 690 RPM vertical turning lathe was manufactured. Under these circumstances, there was no partial disclosure of material facts giving rise to a duty to disclose as in prior Kentucky cases. *See, e.g., Bryant v. Troutman,* 287 S.W.2d 918 (Ky.1956) (failure of seller to disclose known defects in house); *Highland Motor Transfer Co. v. Heyburn Bldg. Co.,* 237 Ky. 337, 35 S.W.2d 521 (1931) (failure of property owner to disclose to excavation company that old swimming pool filled with earth and debris lay beneath vacant lot to be excavated); *Dennis v. Thomson,*

240 Ky. 727, 43 S.W.2d 18 (1931) (failure to disclose in prospectus that corporation was insolvent, had no current manufacturing production and no enforceable contracts with customers). Moreover, even if this early-on concern could be deemed a "fact" "mere silence does not constitute fraud [by omission] where it relates to facts open to common observation or discoverable by the exercise of ordinary diligence, or where means of information are as accessible to one party as to the other." *Bryant,* 287 S.W.2d at 920–21. This initial general engineering issue was known to both Ingersoll Rand and Giddings & Lewis.

In sum, Industrial Risk Insurers has not stated a viable claim of fraud by omission because it has not established any grounds for a duty to disclose. In any event, the matter not disclosed was not a past or present material fact known only to Giddings & Lewis but rather an initial general engineering concern known to both the manufacturer and Ingersoll Rand. Thus, although for different reasons, we conclude the trial court properly dismissed Industrial Risk Insurers fraud by omission claim. Having found the absence of a duty to disclose, we do not reach the issue of what effect the economic loss rule has on a fraud by omission claim.

### CONCLUSION

The trial court properly determined as a matter of law that the product at issue in this case is the Diffuser Cell System bargained for by Ingersoll Rand and that the losses claimed are purely economic losses. The economic loss rule precludes an action to recover those losses in tort, based on negligence, strict liability or negligent misrepresentation and, consequently, the trial court properly dismissed those claims. The fraud by omission claim was also properly dismissed because as a matter of law there was no duty to disclose and, in any event, no undisclosed past or present material fact. For these reasons, we af-

firm in part and reverse in part the opinion of the Court of Appeals, rendering final the trial court's grant of summary judgment to Giddings & Lewis.

All sitting. All concur.