RENDERED: APRIL 16, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0391-MR

WICKMAN CONSTRUCTION, INC.
AND CRAIG T. WICKMAN,
INDIVIDUALLY                                                                    APPELLANTS


                          APPEAL FROM WARREN CIRCUIT COURT
v.                        HONORABLE STEVE ALAN WILSON, JUDGE
                          ACTION NO. 18-CI-00043


SAMANTHA DUNCAN                                                                     APPELLEE


                                        OPINION
                                       AFFIRMING

                                    ** ** ** ** **

BEFORE: JONES, LAMBERT, AND MAZE, JUDGES.

JONES, JUDGE: Appellants, Wickman Construction, Inc., and Craig T.

Wickman, Individually (collectively referred to as "Wickman") appeal the

judgment of the Warren Circuit Court granting summary judgment to Samantha

Duncan. Duncan initially brought suit to enforce a settlement agreement

(hereinafter referred to as the "Agreement") between the two parties as it relates to

a dispute over a real estate purchase made by Duncan from Wickman. Wickman

filed a counterclaim, alleging that Duncan fraudulently induced Wickman to enter into the Agreement by misrepresenting the condition of the property. Duncan moved for summary judgment just four days after Wickman filed its counterclaim, which the Warren Circuit Court granted. Following review of the record and applicable law, we AFFIRM for the reasons more fully explained below.

## I.    BACKGROUND AND PROCEDURAL HISTORY

On November 20, 2014, Duncan entered into a land sales contract with Wickman for the purchase of a residential property located in Bowling Green, Kentucky. As provided by the contract, Duncan paid a down payment of $15,000.00 and was obligated to make her payments in monthly installments thereafter. Duncan made all of her payments with the exception of one payment in 2015 due to an interruption in her employment. According to Duncan, Wickman agreed to waive the default, and Duncan resumed making monthly payments thereafter.

In 2017, Duncan made plans to sell the property and pay off the land sales contract in full. However, Duncan alleges that, upon learning of her plans, Wickman began threatening her with foreclosure as a result of her missed payment in 2015. The parties attempted to resolve the issue without litigation and scheduled a settlement conference for July 26, 2017. There, they reached a

resolution, which they memorialized with a written Agreement. The Agreement

stated as follows:

> Wickman Construction, Inc. and Samantha Duncan
> entered into a Land Sales Contract . . . on November 20,
> 2014. A dispute with regard to the parties['] 
> performance thereunder having arisen and Craig
> Wickman with his Attorney, Matt Baker, and Samantha
> Duncan with her Attorney, T. Brian Lowder, having met
> and conducted a settlement conference on July 26, 2017,
> and the parties having reached an agreement, hereby
> agree as follows:
>
> Duncan and her family members shall vacate the
> property on or before September 1, 2017. Wickman shall
> pay Duncan $10,000.00 on or before August 31, 2017.
> Thereafter, Wickman shall pay Duncan $13,400.00
> within 120 days or upon the sale of the property,
> whichever occurs first. Duncan agrees to maintain the
> property in its current condition[,] ordinary wear and tear
> excepted. The parties agree that realtor, Matt Tabor,
> shall conduct a walk thru of the property within seven (7)
> days of the date of this agreement and shall note any
> issues in writing with respect to the property's condition.
> Duncan shall have the opportunity to supplement Mr.
> Tabor's list of issues, if necessary, and shall
> acknowledge her acceptance of his list with her signature.
> Duncan shall cooperate in the scheduling and showing of
> the property.
>
> In consideration of the aforementioned terms, the parties
> do hereby mutually release, acquit and forever discharge
> one another, as well as one another's heirs, executors,
> administrators, agents or assigns, and all other persons,
> firms or corporations liable or who might be claimed to
> be liable, of and from any and all actions, causes of
> action, claims, demands, costs, loss of services, expenses
> and compensation, on account of, or in any way growing
> out of the Land Sales Contract with regard to the

sale . . . .

Record (R.) at 22-23.

Accordingly, the Agreement specifically contemplated that Wickman would receive the property in its current condition, ordinary wear and tear excepted. According to Duncan, "Wickman never requested any disclosures be completed, did not request to inspect the property before the [A]greement was signed, and did not make the [A]greement in anyway contingent on an inspection. Again, the only agreement was that [Duncan] maintain the home in its current condition, ordinary wear and tear excepted, from the date the [A]greement was signed to the date she vacated on September 1, 2016." R. at 17.

Matthew Tabor, Wickman's realtor, completed the walkthrough and noted the issues with the property's condition during the appropriate window. Although Wickman represents that Duncan claimed at the settlement conference that the condition of property was "like new" and "perfect," Tabor noted, among other things, a number of carpeting defects and that the "house needs a deep cleaning." R. at 24, 27. Nevertheless, Wickman did not seek to void the Agreement.

Duncan timely vacated the property in accordance with the Agreement; however, Wickman failed to pay the first $10,000.00 by August 31,

2017, instead delaying payment until September 4, 2017. Wickman then refused to pay the additional $13,400.00 upon the expiration of the 120 days.

On January 9, 2018, Duncan filed suit in Warren Circuit Court, seeking to enforce the Agreement. On January 16, 2018, Wickman answered Duncan's complaint and filed a counterclaim alleging that Duncan fraudulently induced Wickman to "enter into [the Agreement] by misrepresenting the condition of the premises and purposefully failing to disclose by act and/or omission the true condition of the property." R. at 10. On February 2, 2018, Duncan answered the counterclaim, denying Wickman's allegations of fraudulent inducement, and, on February 6, 2018, just four days later, moved for summary judgment in her favor.

Wickman filed his response to Duncan's motion for summary judgment on February 12, 2018, supporting his response with two affidavits. Tabor, Wickman's realtor and first affiant, stated:

> Many of the things that I was able to observe during the re-inspection could not have been observed during my initial walk through on July 29, 2017. Specifically, I have observed from the re-inspection that the carpeting throughout the premises is in far worse condition, to the point that one or more dogs have obviously defecated and/or urinated throughout the house, and this has soaked through carpet, the padding, and absorbed into the wooden floor beneath. There was no way that anyone could have observed this on a cursory walk through.
>
> It is my understanding that when Ms. Duncan moved into the residence, it was brand new, and she was the first occupant. She obviously knew, or should have known,

of the damage that her dogs were doing to the carpet, the padding, and the floor underneath, but she did not disclose this to me at any time.

The interior paint, as well as the condition of the hardwood floors, was also in far worse condition that could have been observed during the walk through, as much of the furniture and other personal property concealed the actual condition of the paint and flooring throughout the house.

R. at 34.

Wickman also provided an affidavit, stating:

After [Duncan] vacated the premises, it was clear that [her] representations [of the property's conditions] were absolutely false. We learned that Samantha Duncan kept at least one dog, and possibly more, in the house, and the dogs were not "house trained." It was clear that they had urinated and defecated all throughout the house, and that the mess that these dogs had made had soaked into, and through the carpet and hardwood floors. The same is true for the garage floor. The carpet was ruined, and so was the floor underneath. The hardwood floors were stained and warped, and they needed to be refinished because of the mess the dogs had made.

. . .

Finally, we also learned that approximately two inches of water had collected underneath the house, because the downspouts from the gutters had been re-routed, re-configured, and re-positioned to make the water from them flow directly under the house.

R. at 37.

On April 11, 2018, the Warren Circuit Court granted Duncan summary judgment. The circuit court held that Wickman's affidavits were extrinsic evidence to the contract, irrelevant to the unambiguous Agreement, explaining:

> Based on the terms of the settlement agreement, Wickman acknowledged that he was purchasing the property "in its current condition ordinary wear and tear excepted," which would indicate that he accepted the condition of the property as it was at that moment in time. The record reflects that Duncan and her family had resided at the property for three years. If Wickman wanted to be sure of the property's condition, the onus was on him to inspect it prior to signing the contract to ensure that he was willing to go through with the terms of the settlement agreement.
>
> Even in the light most favorable to the nonmoving party, Wickman has failed to demonstrate any genuine issue of material fact. *Steelvest*, 807 S.W.2d at 480 (internal citations omitted). Neither party disputes the fact that they both intended to be bound by the terms of the settlement agreement. Duncan upheld her end of the bargain by vacating the property at the designated time and by allowing the agreed upon realtor to inspect the house. Any issues Wickman might have had with the property should have been addressed after the realtor's walkthrough inspection or even before he agreed to purchase back the property, not after the parties had already negotiated and executed the settlement agreement.

R. at 41-42.

Wickman moved for reconsideration and/or to vacate, alter, or amend the circuit court's order on April 23, 2018, arguing that Duncan concealed material

defects in the property and thereby fraudulently induced Wickman into signing the settlement agreement. On April 27, 2018, Duncan responded and, curiously, filed a second motion for summary judgment addressing Wickman's claims of fraudulent misrepresentation, despite the circuit court not having vacated its judgment. On May 11, 2018, Wickman moved to file an amended counterclaim, alleging fraudulent concealment of three liens on the property.[1]

On June 6, 2018, the circuit court ordered Duncan to execute a quitclaim deed to Wickman so that Wickman could sell the property vacated by Duncan. It further ordered Wickman to deposit $15,000.00 into the offices of the Warren Circuit Clerk pending further orders of the circuit court to cover the remaining $13,400.00 owed under the terms of the settlement agreement and $1,600.00 in interest that could accrue while the case pends before the court. Following this order, on June 13, 2018, Wickman filed an additional affidavit claiming that Duncan expressly informed him that there were no liens or other encumbrances on the property.

On October 17, 2018, the circuit court denied Wickman's motion for reconsideration and granted Duncan's supplemental motion for summary judgment, observing that, under Kentucky law, a person may only be held liable

---

[1] The McClellan Homeowners Association, Inc. filed a lien on the property on September 10, 2015, for failure to pay homeowners association fees. The remaining two liens on the property are tax liens filed on August 24, 2016, and August 23, 2017.

for fraud when making misrepresentations if they are "not only untrue, but also made under such circumstances as would be reasonably calculated to deceive one while exercising ordinary care for his own protection." *See Kreate v. Miller*, 226 Ky. 444, 11 S.W.2d 99, 102 (1928). The circuit court ruled that Wickman's alleged reliance on Duncan's words was not reasonable because Wickman failed to request to inspect the property prior to contracting or to undertake any search into the public record regarding any liens or encumbrances. R. at 113. The circuit court further found that the provisions of the agreement expressly released Duncan from any and all liability stemming from the liens on the property.

On October 22, 2018, Wickman filed a notice of appeal, which our Court dismissed on February 12, 2020, as interlocutory because there had been no adjudication of the damages and interest allegedly owed to Duncan. Duncan moved to dismiss her final claim of conversion on February 20, 2020, to which Wickman had no objection, and on March 5, 2020, the Warren Circuit Court entered a final order and judgment addressing damages and dismissing the conversion claim. This appeal followed.

## II. STANDARD OF REVIEW

"[S]ummary judgment is to be cautiously applied and should not be used as a substitute for trial" unless "there is no legitimate claim under the law and it would be impossible to assert one given the facts." *Steelvest, Inc. v. Scansteel*

*Serv. Ctr., Inc.*, 807 S.W.2d 476, 483 (Ky. 1991); *Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 916 (Ky. 2013). A motion for summary judgment should be granted "[o]nly when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor" even when the evidence is viewed in the light most favorable to him. *Steelvest*, 807 S.W.2d at 482; *Shelton*, 413 S.W.3d at 905. To survive a properly supported summary judgment motion, the opposing party must have presented "at least some affirmative evidence showing that there is genuine issue of material fact for trial." *Steelvest*, 807 S.W.2d at 482; *see also Neal v. Welker*, 426 S.W.2d 476, 479 (Ky. 1968) ("When the moving party has presented evidence showing that . . . there is no genuine issue of material fact, it becomes incumbent upon the adverse party to court that evidentiary showing by some form of evidentiary material reflecting that there is a genuine issue pertaining to a material fact.").

"The standard of review on appeal from summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996) (citing CR[2] 56.03). Because there are no factual findings at issue, the appellate court reviews that trial court's decision *de novo*. *Shelton*, 413 S.W.3d at 905.

---

[2] Kentucky Rules of Civil Procedure.

### III. ANALYSIS

On appeal, Wickman argues that he was deprived of the opportunity to conduct meaningful discovery regarding his claim that he was fraudulently induced into the Agreement. In doing so, Wickman appears to conflate fraudulent omission[3] and misrepresentation. "Fraud by omission is not the same, at law, as fraud by misrepresentation, and has substantially different elements." *Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. App. 2003). Wickman relies upon *Bryant*, 287 S.W.2d at 920, and *Highland Motor Transfer Co. v. Heyburn Building Co.*, 237 Ky. 337, 35 S.W.2d 521, 523 (1931), for the propositions that: (1) where a purchaser of real estate was induced into a written contract in reliance upon false representations of latent defects in the property known to the seller, and the seller remains silent with the knowledge that the buyer is acting on the assumption that no defect exists, the buyer has a cause of action against the seller for fraudulent concealment; and (2) "false and fraudulent representations made by one of the parties to induce the other to enter into the

---

[3] While Wickman refers to fraudulent concealment, Kentucky law uses "concealment" and "omission" interchangeably. *Bryant v. Troutman*, 287 S.W.2d 918, 920 (Ky. 1956) ("In the sale of real estate the intentional suppression of facts known to the seller and unknown to the purchaser is ground for an action for deceit if the purchaser was damaged by reason of the fraudulent concealment. Where there is a latent defect known to the seller and he remains silent with the knowledge that the buyer is acting on the assumption that no defect exists, the buyer has a cause of action against the seller for an intentional omission to disclose such latent defect."); *see House v. Bristol-Myers Squibb Co.*, No. 3:15-CV-00894-JHM, 2017 WL 55876, at *8 (W.D. Ky. Jan. 4, 2017) (quoting *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011)).

contract, are not merged in the contract [and parol] evidence is admissible to show that the making of the contract was procured by fraudulent representations." *Bryant*, 287 S.W.2d at 920.

Wickman's argument fails at the outset in its characterization of the contract between Wickman and Duncan. Although Wickman repeatedly characterizes the contract between Wickman and Duncan as a sale of real estate, it is not. The initial contract between Wickman and Duncan was in fact a land sales contract, a type of contract in which full title to a parcel of land is not conveyed until the buyer has paid the entire contract price.[4] Accordingly, at the time Duncan

---

[4] In Kentucky's landmark case governing land sales contracts, *Sebastian v. Floyd*, 585 S.W.2d 381 (Ky. 1979), the Kentucky Supreme Court explained:

> When a typical installment land contract is used as the means of financing the purchase of property, legal title to the property remains in the seller until the buyer has paid the entire contract price or some agreed-upon portion thereof, at which time the seller tenders a deed to the buyer. However, equitable title passes to the buyer when the contract is entered. The seller holds nothing but the bare legal title, as security for the payment of the purchase price. *Henkenberns v. Hauck*, 314 Ky. 631, 236 S.W.2d 703 (1951).
>
> There is no practical distinction between the land sale contract and a purchase money mortgage, in which the seller conveys legal title to the buyer but retains a lien on the property to secure payment. The significant feature of each device is the seller's financing the buyer's purchase of the property, using the property as collateral for the loan.
>
> Where the purchaser of property has given a mortgage and subsequently defaults on his payments, his entire interest in the property is not forfeited. The mortgagor has the right to redeem the property by paying the full debt plus interest and expenses

decided to sell the property, she did not own the property outright; Wickman still retained legal title. Therefore, it must be understood that the settlement agreement was not a sale of the *property* itself but a settlement of the parties' *rights* to it.

"[S]ettlement agreements are a type of contract and therefore are governed by contract law[.]" *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003) (quoting 15 AM. JUR. 2D, *Compromise and Settlement* § 9 (2000)). "'[I]n the absence of ambiguity[,] a written instrument will be enforced strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Id*. at 106 (quoting *O'Bryan v. Massey-Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky. 1966)); *see also Mounts v. Roberts*, 388 S.W.2d 117, 119 (Ky. 1965). The parties do not dispute that the Agreement is unambiguous, and therefore extrinsic evidence is inadmissible unless offered as evidence of fraud, accident, or mistake in contracting. *Humana, Inc. v. Blose*, 247 S.W.3d 892, 895 (Ky. 2008) ("[A

---

incurred by the creditor due to default. In order to cut off the mortgagor's right to redeem, the mortgagee must request a court to sell the property at public auction. See Lewis, Reeves, *How the Doctrine of Equitable Conversion Affects Land Sale Contract Forfeitures*, 3 Real Estate Law Journal 249, 253 (1974). See also KRS 426.005, 426.525. From the proceeds of the sale, the mortgagee recovers the amount owed him on the mortgage, as well as the expenses of bringing suit; the mortgagor is entitled to the balance, if any.

*Id.* at 382-83.

settlement agreement] is subject to impeachment if procured by fraud, bad faith, or false and fraudulent representations."); *Akins v. City of Covington*, 265 Ky. 740, 97 S.W.2d 588, 590 (1936) ("The long-established and well-settled general rule, controlling the right to introduce extrinsic evidence to modify or vary the terms of a written contract, is that such evidence is inadmissible for such purpose, in absence of either fraud, accident, or mistake in its procurement.").

Unlike contracts for the sale of real estate, settlement agreements do not generally impose upon any party an affirmative duty to disclose material defects. *See Waldridge v. Homeservices of Kentucky, Inc.*, 384 S.W.3d 165, 171 (Ky. App. 2011). "A duty to disclose facts is created only where a confidential or fiduciary relationship between the parties exists, or when a statute imposes such a duty, or when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure."[5] *Rivermont Inn*, 113 S.W.3d at 641 (citing *Dennis v. Thomson*, 240 Ky. 727, 43 S.W.2d 18 (1931)). Wickman has not alleged that Duncan had any duty to disclose, and we will not undertake to find one

---

[5] Our Supreme Court has provided examples of partial disclosure of material facts giving rise to a duty to disclose in *Bryant*, 287 S.W.2d 918, in which the seller failed "to disclose known defects in house" and *Highland Motor*, 35 S.W.2d 521, in which a property owner failed to "disclose to excavation company that old swimming pool filled with earth and debris lay beneath vacant lot to be excavated." *Giddings*, 348 S.W.3d at 748. Although Wickman relies on *Highland Motor* in advancing his claim of fraud, he has not alleged that Duncan made partial disclosure of material facts. For this reason, further analysis of *Highland Motor* and partial disclosure is unnecessary.

for her.  Moreover, it is clear from the face of the settlement agreement that Duncan did not promise that the property was in any specific condition.  As noted by the circuit court, Duncan's promise to Wickman was to maintain the property in its condition as of July 26, 2017, the date the parties and their counsel signed the Agreement.  Had Wickman desired to inspect the property before he entered into the Agreement for the purpose of ascertaining the property's condition and value, he could have easily done so.  He did not.[6]  Under these circumstances, we do not believe that Duncan had an affirmative duty to disclose anything about the property's condition to Wickman.  As such, to the extent that Wickman proffers a claim of fraudulent omission or concealment of defects on the property, his claim fails on its face.[7]

With regard to Wickman's claim of fraudulent misrepresentation, it is well-established that "mere silence does not constitute fraud where it relates to facts open to common observation or discoverable by the exercise of ordinary

---

[6] "Mrs. Beach chose, with advice of counsel, to settle her claim for less than the amount of the judgment. The fact that in retrospect it may appear that she exercised bad judgment is no ground for relieving her from the settlement agreement. Nor is there any consideration of public policy that prevents the enforcement of such an agreement." *Martin v. Beach*, 452 S.W.2d 418, 419 (Ky. 1970).

[7] "To prevail on a claim of fraudulent omission, a plaintiff must prove:  (a) *a duty to disclose a material fact*; (b) a failure to disclose a material fact; and (c) that the failure to disclose a material fact induced the plaintiff to act and, as a consequence, (d) to suffer actual damages." *Waldridge*, 384 S.W.3d at 171 (citing *Rivermont Inn*, 113 S.W.3d at 641) (emphasis added).

-15-

diligence, or where means of information are as accessible to one party as to the other." *Bryant*, 287 S.W.2d at 920-21 (citations omitted); *see also Waldridge*, 384 S.W.3d at 171. To succeed on a claim for fraudulent inducement by misrepresentation under Kentucky law, a party must prove by clear and convincing evidence that:

> (1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) the defendant knew the representation to be false or made it with reckless disregard for its truth or falsity; (4) the defendant intended to induce the plaintiff to act upon the misrepresentation; (5) the plaintiff reasonably relied upon the misrepresentation; and (6) the misrepresentation caused injury to the plaintiff. *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009)[;] *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464 (Ky. 1999).

*Giddings*, 348 S.W.3d at 747.

However, it is vital that a person exercise ordinary care for his own protection when entering into a contract. *McClure v. Young*, 396 S.W.2d 48, 51 (Ky. 1965). "[T]he plaintiff['s] reliance, of course, must be reasonable, or, as the Restatement states, 'justifiable.'" *Flegles*, 289 S.W.3d at 549 (quoting RESTATEMENT (SECOND) OF TORTS § 537 (1977)) (citations omitted). Courts will generally "give no relief to a complaining party who has means of knowledge of the truth or falsity of representations at hand[.]" *McClure*, 396 S.W.2d at 50 (citing *Mayo Arcade Corp. v. Bonded Floors Corp.*, 240 Ky. 212, 41 S.W.2d 1104, 1108 (1931)). "[I]f the recipient of a fraudulent misrepresentation has the

-16-

opportunity to verify a representation through ordinary vigilance or inquiry and does not do so, the false representation, even when made with the intention to deceive, has no legal effect on the rights of contracting parties." *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 46 (Ky. 2018). "In short, the law imposes upon recipients of business representations a duty to exercise common sense." *Flegles*, 289 S.W.3d at 549. Accordingly, to prevail on his counterclaim, Wickman must proffer evidence that he *reasonably* relied upon Duncan's alleged misrepresentations regarding the condition of the property.

Even accepting as true Wickman's allegations of Duncan's oral representations, which were not included in the final written agreement, as to the "perfect" condition of the property, we cannot say that Wickman conducted himself with ordinary care for his own protection in relying on such statements. *McClure*, 396 S.W.2d at 51. The onus was on Wickman to inspect or to at least request to inspect the property *prior* to signing the agreement. Likewise, the three liens against the property in question were properly recorded and would have been readily discoverable in the public record had Wickman or his counsel undertaken a title search. Moreover, since Wickman still held legal title to the property, he should have already been aware of the existence of the liens as a matter of due diligence.

The settlement agreement clearly contemplated Wickman accepting the property in its "current condition" as to be maintained by Duncan during the final month of her possession of the property. Wickman does not assert that he took a single precautionary measure to ensure that the property was in satisfactory condition; instead, Wickman and his legal counsel chose to blindly contract for the property "in its current condition." We can give no relief to a complaining party who has the means to investigate the veracity of a contracting party's assertions and yet willfully chooses not to exercise them. *Id*. at 50.

Having closely reviewed the record, we do not believe that additional time for discovery would have added anything to the dispute. Even taking the affidavits produced by Wickman as true, we cannot conclude that the Agreement should be set aside. The Agreement was clear that Wickman was settling his claim regarding his alleged right to foreclosure based on the land sales contract. Under these circumstances, Duncan did not have duty to disclose anything to Wickman. The parties were settling their respective rights in relation to their previous land sales contract.

"Whether a summary judgment was prematurely granted must be determined within the context of the individual case." *Suter v. Mazyck*, 226 S.W.3d 837, 842 (Ky. App. 2007). The party opposing summary judgment party must proffer "specific examples of what discovery could have been undertaken that

-18-

would have affected the outcome had it been conducted" to demonstrate that summary judgment is inappropriate. *Benton v. Boyd & Boyd, PLLC*, 387 S.W.3d 341, 344 (Ky. App. 2012). If the discovery sought to be taken would not change the outcome, the party has not been denied the opportunity for meaningful discovery. *Ray v. Stone*, 952 S.W.2d 220, 223 (Ky. App. 1997).

In this case, Wickman was afforded only a handful of days during which to engage in discovery and fact development, and yet he has not offered any examples of discovery yet to be conducted that could have affected the claims before us. Rather, he argues generally that "the pleadings and affidavits in opposition to the motion for summary judgment clearly created genuine issues of material fact, such that summary judgment was improvidently granted." Appellant's Brief at 14. Wickman's pleadings and affidavits are offered to support his claim of fraudulent omission in a sale of real estate. *See Bryant*, 287 S.W.2d at 920. However, because the contract at issue is in fact a settlement agreement, Wickman must also assert that Duncan had a duty to disclose; Wickman did not provide evidence of this essential element and therefore failed to establish a *prima facie* claim. *See Waldridge*, 384 S.W.3d at 171. Finally, Wickman's claim of fraudulent misrepresentation fails as a matter of law because Wickman did not take any steps at all to exercise any ordinary care on his own behalf prior to entering into the settlement agreement.

## IV. CONCLUSION

In light of the foregoing, we AFFIRM the Warren Circuit Court's judgment.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Matthew J. Baker<br>Bowling Green, Kentucky | T. Brian Lowder<br>Bowling Green, Kentucky |